## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

   **v.**                     **Case No.**    **22-CR-265**

**MARKEITH PHIPPS,**

   **Defendant.**

## REPORT AND RECOMMENDATION
## TO DENY MOTION TO SUPPRESS

Police arrested Markeith Phipps pursuant to a valid arrest warrant issued after he failed to appear for a revocation sentence in Case No. 17-CR-28. Phipps was a fugitive at the time, sleeping in the home of Santana Retic, a woman with whom he had a romantic relationship. When police rousted both of them from bed, they saw a firearm in plain sight next to the bed and later recovered drugs from the pocket of Phipps' jeans; this evidence gave rise to the indictment in the present action. Phipps argues that the entry into Retic's home was illegal and moves to suppress the evidence. After a two-day evidentiary hearing, and several extensions of time for briefing, the matter is ready for disposition. Because the police had a valid arrest warrant, all they needed was probable cause to believe Phipps would be located at Retic's home. They had ample reasons for believing Phipps would be located there. I therefore recommend that the motion be denied.

### I.    Background

On April 15, 2022, Judge J.P. Stadtmueller issued a warrant for Phipps' arrest based on the revocation of Phipps' supervised release. Phipps failed to surrender on his own.

However, he did keep in contact with his supervising probation officer, Kristina Langteau. On May 2, he texted her to inform her that he felt like he was backed against the wall and that he knew law enforcement was looking for him. Tr. I at 12.[1] He added, "I will not go to any address I wrote in prison or that I gave you guys on file." *Id.* at 13. Langteau testified that she interpreted this to mean that Phipps would not be staying at either of the two addresses her office knew about already, which were his mother's house on 73rd Street and a girlfriend's house on 50th street. *Id.* at 7-9. However, she acknowledged that sometimes Phipps had been untruthful, for example, with respect to his drug use. *Id.* at 19.

The U.S. Marshals Service apprehends federal fugitives. Deputy U.S. Marshal Todd Marratt received Phipps' two known addresses from Langteau. He also learned that Phipps had said he would *not* be found at a known address, *id.* at 15, although Langteau had not told him to categorically rule out those two addresses either, *id.* at 27. Marratt testified that he drove past the two known addresses six to eight times looking for Phipps' vehicles, but he never saw Phipps or the vehicles. *Id.* at 34. He also turned to social media to find clues about Phipps' location. On Facebook, he found Phipps posing with a Mercedes-Benz, and later learned that a Mercedes-Benz was registered to Phipps. *Id.* at 36-37. Marratt also knew that Phipps was associated with a tow truck. *Id.* at 39.

Marratt handed the case off to Deputy Kevin Smith in July 2022. Smith testified that Marratt had told him Phipps was driving a silver Mercedes-Benz. *Id.* at 52. He also saw on Facebook that Phipps' profile picture—the first picture that people see on his page—showed him posing with the Mercedes. *Id.* at 56. Smith described the postings on the Facebook

---

[1] The transcript is located at ECF Nos. 33 and 34. Herein I will refer to the first day of hearings as Tr. I and the second day as Tr. II.

account as "frequent and recent." *Id.* Like Deputy Marratt, Smith conducted physical surveillance at the two known addresses (despite Phipps' statement that he would not be at either one) and came up empty. Deputy Smith also uncovered that other cars were registered to Phipps, in particular, a 2000 Jeep Wrangler, a 2007 Infiniti, and a 2008 Honda Odyssey. *Id.* at 98.

Eventually Smith applied for and received a warrant to search the non-public parts of Phipps' Facebook account. The search uncovered several relationships with women, some of them of an intimate nature. *Id.* at 61. Smith focused on communications to Phipps made by Santana Retic, which included a photo of herself wearing a "limited amount of clothing." *Id.* at 63. In one communication, she tells Phipps to "bring your ass home," which Deputy Smith interpreted as meaning that both parties believed that Retic's address was "home." *Id.* at 64. There were also intimate communications from a woman named Anastasia during a similar timeframe. *Id.* at 78-81. In addition, during the same period there were frequent intimate messages to and from a woman named Sharkita. *Id.* at 82-87.

Within a few days of receiving the warrant return, Deputy Smith began surveilling Retic's home and saw Phipps' 2014 Mercedes-Benz parked outside the residence at approximately 1:00 p.m. on September 7, 2022. *Id.* at 64. Two days later, around 7:00 a.m., Smith again saw the Mercedes parked there. *Id.* at 64-65. In Smith's view, they'd found their man. Combined with the email from probation indicating that Phipps would be avoiding his known residences, the intimate Facebook messages from Retic, and Phipps' car being parked outside Retic's address, Smith testified that "our investigation led us to believe that this was one of Markeith Phipps' residences." *Id.* at 65.

3

The same morning (September 9), Deputy Smith and about six other officers (mostly deputy U.S. marshals) converged at Santana Retic's house to arrest Phipps. The officers brought breaching tools, including a battering ram, and some had their weapons drawn. Soon after the officers announced their presence, Retic's teenaged son appeared and was escorted down the front steps into the yard. There is a dispute as to whether, at this point, he told officers that Phipps was in the house. He testified both that he "probably knew" Phipps was in the house and then that he *didn't* know if Phipps was in the house because he was "mostly asleep." Tr. II:84-85. Regardless of what he actually knew, however, he conceded that he "probably" told the officers that Phipps was there. *Id.* at 85.

Q: So you did say he was in the house?

A: Technically yeah in the heat of the moment.

*Id.*

Soon after, Retic's mother left the house. She testified that she had been staying there for about three months. She might have met Phipps once before but generally did not keep tabs on her daughter's business and did not know Phipps. Tr. I:117. She also said she had no idea whether he was at the home when the police arrived. *Id.* at 118.

After Retic's mother and son left the building, police entered and began looking for Phipps. Once they were upstairs, officers located Phipps and Retic sleeping in bed. *Id.* at 153. They handcuffed both and escorted them outside. Officers also noticed a firearm in plain view. Specifically, an "AR platform pistol was immediately observed propped up on the bedpost nearest to" Phipps. *Id.* at 154. (Ex. 5, 6.) Chief Deputy U.S. Marshal Jeremy Loesch was the supervisor on the scene and took a few cellphone photos of the bedroom. Loesch testified that, due to the presence of the firearm, officers needed to determine whether Retic

4

was a felon. *Id.* at 156-57. (They already knew Phipps was a felon.) Loesch's initial check, done on his cell phone, indicated a "CF" (criminal felony) charge on CCAP, the Wisconsin court database, which caused him to ask other officers for help determining the nature of that charge. *Id.* at 157.

After Retic and Phipps were escorted out of the building, Loesch remained in the bedroom, in part to find clothes for Phipps, who had been wearing only boxer shorts. *Id.* at 156-57. An officer radioed Loesch that Phipps' clothes were at the foot of the bed. Loesch found a t-shirt and a pair of jeans. Loesch testified that he searched the jeans "to ensure there was no contraband inside of them because we would not want to dress a person with contraband inside their clothing and introduce that into our cell block." *Id.* at 158. The primary concern was weapons, as their transport vans were staffed by unarmed law enforcement. *Id.* While searching the jeans, Loesch uncovered a "sunglasses bag" that contained two baggies of cocaine or crack cocaine. *Id.*

All the while Retic was outside, handcuffed, and speaking with officers about her prior record. Tr. II:100-06. Loesch testified that another officer told him Retic was not a felon, and at that point her handcuffs were removed. Tr. I:160. Officer Leannais, the officer speaking to Retic outside, testified that the handcuffs were removed "shortly after we learned that she was, in fact, not convicted of a felony and instead the case was plead (sic) down to a misdemeanor. It was prior to Supervisor Loesch returning back to my location." *Id.* at 222. Officer Leannais believed Retic might cooperate, and so the officers then determined to obtain her consent to search the property. *Id.* at 160. (Phipps argues that the idea for getting her consent came from an assistant U.S. attorney whom Loesch consulted.) Loesch left the house, joined Leannais and Retic, and then escorted Retic to the side of the house. He testified that

5

her demeanor was calm and cooperative, and she denied the presence of any firearms or drugs in the house. *Id.* at 162-63. She became upset and defensive, however, when Loesch showed her a photo of the firearm found in her bedroom. According to Loesch, Retic's anger was directed not at him but at Phipps—she'd told him no guns or drugs were allowed in the house. *Id.* at 163, 165; Tr. II at 107. According to Retic herself, she was upset because she hadn't seen the gun before, and the photos suggested the police had "ram shacked" her bedroom because things were out of place. Tr. II at 105-06.

At that point Loesch attempted to gain Retic's consent to search the home. Loesch testified that Retic was initially hesitant because "she had been through this before and she was concerned that [law enforcement] would ransack her house and damage her property." Tr. I at 164. Loesch then told her that the police could be out of the residence within just 30 or 45 minutes, but if they did not receive her consent then they'd freeze the home and attempt to get a warrant. *Id.* That could take "several hours." *Id.* Retic says that they spoke at the side of the house and then went inside to the living room, where officers were speaking with her son about the police academy (her son had expressed interest in becoming an officer). Tr. II at 109. There, she was handed a form to sign. She didn't recall exactly what the form said, but she testified that it was "basically saying that I have to give them permission – I have either a choice to give them permission to do a search or they can get a search warrant." *Id.* Based on her experience with a prior search warrant, she believed that her landlord would be contacted if the police got a warrant to search her house. *Id.* at 110. She also stated that an officer showed her another form that had a list of items they'd found in her room. *Id.* At that point, Loesch testified, Retic "very willingly and very quickly signed the form." Tr. I at 165.[3]

---

[3] The consent form is plaintiff's exhibit 8.

Retic's own testimony suggests that she was not "very willing" but that she acquiesced; in her view, the police had already "searched" her home (given the list of items from the bedroom and the photo of the gun) and "ram shacked" it. And, based on her experience with a previous search, she didn't want her landlord to get involved: "[W]hen they brought the paper in, it was either you sign this to do a search or we get a search warrant." Tr. II at 111. So she signed it. After she signed, Loesch obtained a search kit and Deputy Keller picked up a camera, and they proceeded to search the home. They did not find any other contraband.

## II. Analysis

### A. The *Payton / Steagald* Framework

The principal question presented here is whether the subject of an arrest warrant can object to the absence of a *search* warrant when evidence against him is found when he is arrested in someone else's home. *Payton v. New York* teaches that sometimes an arrest warrant—rather than a search warrant—will suffice. 445 U.S. 573 (1980). For example, when the home to be entered is the home of the subject of that warrant, the police need not obtain an additional search warrant because "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603.

One year after *Payton,* the Supreme Court clarified in *Steagald v. United States* that a search warrant *would* be required to enter the home of a third party to arrest a suspect. 451 U.S. 204, 213-14 (1981). There, the police had a warrant to arrest Lyons and possessed information that he might be located at the home of Steagald. Officers found narcotics in Steagald's home and charged him. The Court sided with Steagald in suppressing the evidence because it found a search warrant was required to enter Steagald's home. In other words, the

7

arrest warrant for Lyons did not relieve police of the need to obtain a search warrant for the third party's home. *Id.*

There is some understandable confusion about the appropriate analysis to apply in this case. Anyone reading *Payton* and *Steagald* together could be forgiven for believing that *Steagald* always requires a search warrant to enter the third party's home, and that *Payton* provides a workaround if the government can show that police reasonably believed the suspect (1) lived in the residence where he was arrested and (2) would be found at that location at the time of the arrest. *Payton*, 445 U.S. at 603 ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.") This is certainly how both sides have approached and briefed this case: the government argues both that (1) Phipps resided with Retic and (2) he was likely to be found there at the time of the arrest, and the defendant vigorously contests both points.

Unfortunately, the two-part framework proposed by the parties gives rise to substantial tension with traditional understandings of the Fourth Amendment. Courts have held repeatedly that a person's home is where he is entitled to the *greatest* protections against government intrusion. *See, e.g., Payton*, 445 U.S. at 585. And so it might reasonably be asked: why would we apply a test requiring the government to argue that the suspect is at *home*, where he is entitled to the *most* protection from the government? And why does the defendant find himself arguing that he was *not* in the place where courts have found he enjoys the most protections? One would think the opposite would be true.

This tension resolves when it's understood that the two-part test proposed by the parties is not *wrong*, it's just that Phipps is the wrong person to be relying on it. The Eighth

Circuit case of *United States v. Risse* is a good example of the test in practice. 83 F.3d 212 (8th Cir. 1996). Officers entered the home of Risse to apprehend Rhoads, his girlfriend. *Id.* at 214. When officers spotted drug paraphernalia in plain view, they charged Risse, the homeowner. When Risse moved to suppress based on the absence of a search warrant for his home, the court engaged in the two-part analysis described above and ultimately concluded that the police reasonably believed that Rhoads lived there and was present at the time of entry. *Id.* at 215-17 Accordingly, evidence found against Risse could be used against him despite the absence of a search warrant for his home. *Id.*

The same analysis applied in *United States v. Kaquatosh,* a case relied on by Phipps, albeit with the opposite result. No. 22-CR-21. There, the police had a warrant for a fugitive named Crowe and entered Kaquatosh's home to find him. When they found an illegal weapon, they ended up charging Kaquatosh, the homeowner. When Kaquatosh moved to suppress, I recommended the motion be granted because officers lacked adequate reason to believe the suspect resided at, or would be found at, the home police entered and searched. No. 22-CR-21, ECF No. 27.[4]

Both of those cases stand for the principle that when evidence is found against a homeowner not named in an arrest warrant, the government must establish both that police believed the subject of the warrant would be found at that home *and* that the subject resided there as well. Here, that would mean that if the police had found evidence against Santana Retic and charged her with a crime, she could move to suppress and require the government to satisfy the two-part *Payton* framework. But she's not a defendant in this case. Phipps, the subject of a valid arrest warrant, is the one moving to suppress. The problem he faces is that

---

[4] The case was then dismissed on the government's motion.

9

*Steagald* applies to protect only Retic; it does not somehow mean that the police needed a search warrant to apprehend *Phipps* in her home. *United States v. Agnew,* 407 F.3d 193, 196 (3d Cir. 2005) ("*Steagald* protected the interests of the third-party owner of the residence, not the suspect himself.").

In short, the two-part test acts as an exception to *Steagald*'s search warrant requirement, but *Steagald* does not come into play here because it protects only Retic, the homeowner, not Phipps. Ultimately, the purpose of the requirement that a suspect *resides* in the location is to determine whether the homeowner-movant (as in *Risse* and *Kaquatosh*) has opened himself up to the warrantless search by sharing control of the home with someone else. *United States v. Richards,* 741 F.3d 843, 850 (7th Cir. 2014) ("A defendant assumes the risk that a co-occupant may expose a common area of a house to a police search."). But this comes into play only when the government is prosecuting the third-party homeowner without having obtained a search warrant (as in *Risse* and *Kaquatosh*). That's not what's happening here. Because the government charged Phipps, the subject of the arrest warrant, the government need not establish a reasonable belief that Phipps resided at Retic's home.[5]

### B. The Standard for Arrests in Third-Party Homes

If the government need not establish that the police believed Phipps resided with Retic, then what, exactly, is the standard? It's much simpler, it turns out. The police, armed with a valid arrest warrant, must simply have probable cause that the subject of that warrant will be located in the place they enter. The Seventh Circuit addressed this question in *United States v.*

---

[5] Another example of the two-part test in practice is *United States v. Williams,* 79 F. Supp. 3d 888 (S.D. Ill. 2015). There, police had an arrest warrant for Smith but mistakenly ventured into the home of Williams and found contraband. *Id.* at 892. When Williams, the third-party homeowner not named in any arrest warrant, was charged, he moved to suppress and won.

*Jackson,* where police, acting on an anonymous tip, found and arrested Jackson at the apartment of his father's girlfriend. 576 F.3d 465, 467 (7th Cir. 2009). Jackson moved to suppress, arguing that a search warrant was required to enter the girlfriend's home to arrest him. The court rejected that argument, finding that the *Steagald* search warrant requirement protects only "*persons not named in the warrant*." *Id.* at 468 (quoting *Steagald*, 451 U.S. at 212) (emphasis added). Thus, because the police had a valid arrest warrant for Jackson, "law enforcement officers [did] not need a search warrant in addition to an arrest warrant to enter a third party's residence in order to effect an arrest." *Jackson¸* 576 F.3d at 468 (citing cases from four other courts of appeals). And here is the key: the court found that because "the subject of an arrest warrant [does not have] a higher expectation of privacy in another person's residence than he does in his own," the arrest warrant authorized the police to arrest him at the girlfriend's house just as they could at his own home. *Jackson¸* 576 F.3d at 468. The same holds true here.

Similarly, in *United States v. Bohannon,* the Second Circuit applied this analysis in a case with facts akin to ours. 824 F.3d 242 (2d Cir. 2016). There, police had reason to believe Bohannon would be found in the home of his girlfriend rather than in his own home. *Id.* at 245-46. Armed with an arrest warrant for Bohannon, but not a search warrant for the girlfriend's home, they entered her home and apprehended Bohannon. "Authorities also searched Bohannon's pants and in one pocket found a large quantity of cash, which they removed before giving the pants to Bohannon so that he could get dressed." *Id.* at 246. The police also found crack cocaine and guns.

11

The court rejected Bohannon's motion to suppress the evidence because any protections the Fourth Amendment provided to the homeowner belonged to his girlfriend, not Bohannon himself:

> The government does not . . . dispute that entry into Shonsai Dickson's home without a search warrant was unlawful as to her in light of *Steagald*. But it is not the third-party resident, Dickson, who is before us in this case. Rather, it is Bohannon, the subject of the arrest warrant executed in Dickson's home.

*Id.* at 249. Because *Steagald* does not protect the arrestee in such a situation, the court looked to *Payton* itself. But *Payton* did not help Bohannon, either, because "requiring police who already hold an arrest warrant for a suspect to obtain a search warrant before they can pursue that suspect in a third party's home would grant the suspect broader rights in the third party's home than he would have in his own home under *Payton*." *Id.* at 250 (quoting *United States v. Snype*, 441 F.3d 119, 133 (2d Cir. 2006)). The *Bohannon* court also noted that "eight of our sister circuits have concluded that the subject of an arrest warrant, apprehended in a third party's residence, may not invoke *Steagald* to claim that his Fourth Amendment rights were violated because entry into the residence was not authorized by a search warrant." 824 F.3d at 250 (citing cases).

In sum, it does not matter whether officers believed the subject of the arrest warrant resided at the location or not. *United States v. Hollis,* 780 F.3d 1064, 1068 (11th Cir. 2015) ("Although the police did not believe that the apartment was Hollis's dwelling, that fact is of no help to Hollis."). That's because *Payton* holds that an arrest warrant authorizes officers to apprehend the subject of that warrant in his own home. 445 U.S. at 602. And appellate cases since *Payton* have concluded that citizens have no greater rights at someone else's home than they do in their own home. *Jackson,* 576 F.3d at 468 ("[I]t would be anomalous if the subject of an arrest warrant had a greater expectation of privacy in another person's home than he

12

had in his own."); *Bohannon,* 824 F.3d at 248 ("[T]he subject's Fourth Amendment privacy rights with respect to entry of that residence are no greater than the privacy rights he would have had if apprehended in his own home."). Therefore, if a suspect may lawfully be arrested in his own home based solely on an arrest warrant, then it follows that he may also be arrested in someone else's home as well. *Agnew,* 407 F.3d at 196 ("[W]hether the home was Agnew's residence is ultimately irrelevant because under any of the possible alternatives the entry pursuant to the arrest warrant did not violate Agnew's Fourth Amendment rights."). It's true that a separate search warrant would be required if the police intend to use evidence found during the arrest against the third-party homeowner, but that's not the scenario we have in this case. *Hollis,* 780 F.3d at 1068–69 ("[W]hen a police officer effectuates an arrest warrant in a third-party's abode, the officer may violate the Fourth Amendment rights of the third-party. . . . But we agree with our sister circuits that the subject of an arrest warrant cannot challenge the execution of that warrant and the later discovery of evidence in a third-party's home.") (collecting cases).

*Jackson, Bohannon, Agnew, Hollis*, and similar cases establish that (1) no separate search warrant is required because *Steagald* protects the third-party homeowner, not the arrestee, and (2) it doesn't matter whether police believe the subject of the arrest warrant resides in the place to be entered. But that does not answer the question as to what *is* required before police can apprehend the subject of an arrest warrant in a third-party's home. Is the arrest warrant enough on its own? Not quite. The cases hold that "[a]lthough officers do not need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing that the suspect is actually present in the home." *Jackson,* 576 F.3d at 468; *Bohannon,* 824 F.3d at 251 (arrest is valid "if, at the time of entry, law enforcement officers possessed a

13

valid warrant for the subject's arrest and reason to believe that he was then in the premises entered"). Noting some disagreement among the circuits, the Seventh Circuit has held that it is "inclined" to adopt the view that police must have probable cause that the subject would be located at the residence they enter. *Jackson,* 576 F.3d at 469. I will address that question next.[6]

### C. There was Probable Cause that Phipps Would be Found at Retic's Residence

A police officer has probable cause if the "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown," that the suspect would be found in the location in question. *Gonzalez v. City of Elgin,* 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). "Probable cause is a common-sense determination, measured under a reasonableness standard. . . . It is an objective test, based upon factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians,

---

[6] I acknowledge that the Fourth Circuit case of *United States v. Brinkley,* which the defendant cites, seems contrary to the above analysis. 980 F.3d 377 (4th Cir. 2020). However, that case is at odds with the many cases cited in *Bohannon* and, more to the point, the Seventh Circuit's holding in *Jackson.* In particular, the *Brinkley* court ignores the fact that the Fourth Amendment applies differently depending on who is moving to suppress. The court applied the two-part test as though the defendant, who was the subject of the arrest warrant, were entitled to protection under *Steagald,* which he is clearly not. Moreover, it appears the Fourth Circuit got it *right* in an unpublished opinion that predates *Brinkley. See United States v. Kern,* 336 F. App'x 296, 298 (4th Cir. 2009) (holding that "Whether Kern was a resident at the farm or an overnight guest is inconsequential"). The First Circuit also seems to have strayed down this path. *United States v. Young,* 835 F.3d 13, 20 (1st Cir. 2016). Interestingly, a concurring judge pointed out that the government argued the case erroneously: "Our analysis takes the form of a two-part *Payton* inquiry because the government chose that legal theory. . . I am not inclined to think either that this case is about 'residence' or that a two-part *Payton* inquiry ought to apply. Because the Walnut Street property was Coleman's residence—not Young's—I consider Young's Fourth Amendment interests to be far weaker than they would have been at Young's own residence." *Id.* at 23 (Lynch, J., concurring). Here, I would not hold the government to its argument at this stage, however, both because the case is in its early stages and because bad law ends up getting produced.

act." *Humphrey v. Staszak,* 148 F.3d 719, 726 (7th Cir. 1998) (internal quotation marks omitted).

There are several facts suggesting it was reasonable for police to believe they would have found Phipps at Retic's home. First, law enforcement engaged in a reasonable process of elimination owing partly to the fact that Phipps had indicated to his probation officer that he would *not* be found at any residence already known to law enforcement. In essence, Phipps was telling law enforcement that they wouldn't find him at his normal haunts—he was going to make them work harder. And that's exactly how it panned out: the marshals' repeated drive-bys and other surveillance suggested Phipps was not using his normal places of residence. That fact, of course, made other possible places of hiding substantially more likely. Locating someone is a zero-sum game: a person must be located *somewhere*, and so if houses A and B are ruled out, other candidates like C or D will become more likely possibilities. And so after coming up blank at Phipps' most likely residences, officers were reasonably entitled to focus on other possibilities that might otherwise have seemed more of a stretch.

Second, the Facebook communications with Santana Retic indicate an intimate relationship. Deputy Smith reviewed some 200 communications between Retic and Phipps during the four months of Facebook records he received. Tr. I at 74. He testified that Retic referred to Phipps as "bae," which stands for "before anyone else." *Id.* at 62-63. "It means that if you have multiple relationships, the person you call Bae would be your number one." *Id.* at 62. In one of her communications Santana Retic had told Phipps to "bring your ass home." Tr. II at 95. And, as noted earlier, at least one of the communications involved an intimate photo. Law enforcement could reasonably view these communications as indicative not just of an intimate relationship, but one which at least Retic viewed as her most important

15

relationship. Deputy Smith could therefore reasonably conclude that she was exactly the kind of person who would let Phipps stay with her while he was avoiding his other residences.

Third, police spotted the Mercedes parked at the home. When police discovered that Phipps' car was parked there both at 1:00 pm on September 7 and again nearly two days later, they reasonably could have believed Phipps would be present at the home where his car was currently parked. They knew the car was registered to him, and the Facebook records suggested the Mercedes was his primary vehicle. Ultimately, once they spotted his car at the home of someone who called him "bae," it was not difficult police work to believe that they would find Phipps there. They had more than enough to satisfy the probable cause standard.

Phipps' efforts to undercut probable cause are unconvincing. For example, Phipps makes much of the fact that he had a number of cars registered to him. But that is a red herring. Even if Phipps has identified other cars he owned, he hasn't identified other *people* who drove those cars, much less the Mercedes in question. If a man has five cars, that doesn't somehow make it any less likely that he is the person driving his car—it just means he has options. It would be different if there were evidence that the Mercedes had five *drivers*, or that Phipps routinely let lots of other people drive his cars. In either scenario (assuming the police were aware of that fact), the inference that Phipps was the driver would be weaker. But without such evidence, the police were entitled to believe the Mercedes was just as probative of Phipps' location as it would be had he owned ten cars. As far as the police knew, the Mercedes was solely driven by Phipps himself, not some still-unnamed mystery driver. Finally, in pointing out that a Honda had more automatic license plate hits, Phipps overlooks the fact that his own Facebook postings made it seem the Mercedes was his primary car. In

16

short, nothing about the Mercedes' presence at Retic's home would have suggested to law enforcement that someone else was currently associated with that car.

Phipps also asserts that the Mercedes had a flat tire that morning, from which officers should have drawn the inference that the car had been essentially abandoned. First, there was no testimony regarding a flat tire at all, much less testimony as to whether the officers knew the tire was flat. The photos in evidence do not show a tire that's obviously flat. (Def. Ex. 10 at 2, 78.) I therefore have no idea whether the tire was actually flat on the morning of the arrest, nor whether any officer noticed the flat tire.

Even if officers did notice a flat tire, they are not required to draw the inference that a car parked at a known associate's home was abandoned by the car's owner. There was no evidence that the Mercedes looked like it had been sitting undriven for any appreciable length of time. And in fact it would be reasonable for officers to draw an inference opposite of that proposed by Phipps. Supposing they observed that the Mercedes had a flat tire, they might reasonably have concluded that he remained close to his car—his favorite car—not that he had abandoned it.

Finally, and most importantly, Phipps hasn't acknowledged what an amazing coincidence it would be if someone else was driving his car *and* just happened to park it in front of the home of a woman with whom Phipps had a romantic relationship. The police are entitled—and required—to use common sense and exercise reasonable judgment. They are not expected to believe in longshot coincidences and rule out strong possibilities merely because the evidence is not ironclad. The notion that they should have ruled out Retic's residence because Phipps' tire was flat or because he owned other cars simply does not comport with reasonable police practices.

17

Phipps also attempts to undercut the marshals' reliance on his relationship with Retic, noting that Phipps had other romantic relationships they should have focused on. First, that argument ignores that Retic called Phipps "bae," indicating that (in her view) they were pretty serious even if not in an exclusive relationship. Deputy Smith reasonably could have determined that a woman who called Phipps "bae" would be the most likely person to put him up while he was a fugitive (whether she knew he was on the run or not). But most importantly, Phipps looks at his relationships in a vacuum without considering the other evidence. Even if Phipps is right that other women might have been more likely to harbor him—not that the record supports that assertion—that merely means that Deputy Smith relied on a hunch when he focused on Retic instead of one or two other women. Hunches do not create probable cause, of course, but they often lead to probable cause. Notably, Phipps cannot escape the fact that none of the other women had Phipps' car parked outside their homes. Connecting the Mercedes to Retic's house was key in building the bridge to probable cause.

In sum, when police know a fugitive is not at his typical places of residence, and when they spot one of his cars parked at the home of a woman with whom he has a relationship, common sense dictates that the fugitive would probably be located in that home. That's all the probable cause standard requires.

**D. Staleness of the Facebook Information**

Finally, Phipps argues that the warrant that authorized the search of Facebook records was stale or invalid when Deputy Smith executed it. Magistrate Judge Joseph, who issued the warrant on August 17, 2022, set an execution deadline of September 1, 2022 (giving officers the standard 14 days). ECF No. 43-1. According to Phipps, Deputy Smith did not execute the

18

warrant until the next day, September 2, 2022, as evidenced by the warrant's return indicating "Date and time warrant executed: 09/02/2022 3:20 pm":



Def. Ex. 19 at 65.

As with the defendant's flat-tire argument, there was no testimony about when the warrant was actually executed, however. Although the return does indicate an "execution" date of September 2, that seems impossible on its face. That's because the return also indicates that "On 09/02/2022, I received Facebook records for the Facebook account . . . ." *Id.* It is common knowledge and experience that Facebook (Meta) and other companies do not routinely—or *ever*—provide responses to warrants on the *same day* the warrant is executed. This is especially true given that the return says the warrant was "executed" at 3:20 p.m. on September 2, close to the end of the business day on the Friday heading into the Labor Day weekend. If Phipps is right, then Facebook received the warrant at 3:20 and then produced its records within just a few *hours*, allowing Smith to receive them that very same afternoon. That likely didn't happen. In all likelihood, Deputy Smith used the term "executed" to mean that's when he *received* the records from Facebook, not when he served the warrant on Facebook.

Even if Phipps were right that the warrant was executed a day late, "[v]iolation of the time limits of Rule 41 . . . is not considered a constitutional violation unless the probable cause dissipated before the warrant was executed." *Harper v. Murphy,* No. 19-C-1822, 2020 WL

620090, at *3 (E.D. Wis. Feb. 10, 2020). Here, the records were received and reviewed in early September 2022, immediately after being supplied by Facebook. The records included Facebook communications between April 15, 2022, and August 17, 2022, the period when Phipps was a fugitive. There is no substantive argument that those records were somehow "stale" in early September. If the point of seeking the records was to find Phipps' contemporaneous relationships and information about his whereabouts, then it's unlikely that information communicated on Facebook during the summer of 2022 would suddenly become stale once the clock struck midnight on September 2. It is, at most, harmless error. *See also United States v. Nyah,* 928 F.3d 694, 700–01 (8th Cir. 2019) ("Even if the warrant was 'executed' one day late when an officer seized the material from Facebook on July 22, probable cause continued to exist. The warrant targeted pre-existing account information, so the affiant's probable cause did not become stale.").

### E. The Gun was in Plain View, and Police Uncovered the Drugs as Part of a Valid Search

The fact that Phipps' in-home arrest was sound does not necessarily mean the gun and drugs police found are admissible. As for the gun, Phipps does not dispute that, if his seizure was valid, the seizure of the firearm was also valid. There was testimony that the firearm was found in plain view next to the bed, and Phipps has not contested that. Accordingly, the plain-view doctrine allows the seizure of the gun. However, in his reply brief, Phipps does contest the search of his pants, which revealed the drugs. He argues that officers had no business obtaining his jeans or searching the pockets.

First, there can be little doubt that officers may search the clothing of someone they are bringing into custody. As Deputy Loesch testified, it was a matter of safety. Officers in any custody setting do not allow individuals into custody without knowing what they're

bringing into the jail, lockup, or prison. So, if Phipps had been arrested while *wearing* his clothes, it should be apparent that officers could have searched his jeans prior to bringing him into custody. *United States v. Jackson,* 377 F.3d 715, 716 (7th Cir. 2004) (noting "the bright-line rule that police are entitled to search the persons and possessions of everyone arrested on probable cause.").

The question here is whether officers may affirmatively retrieve clothes for an unclothed individual they've just arrested (which would then allow them to search the clothes). The answer seems to be "yes," so long as the need for clothing is reasonable and not a pretext to conduct a warrantless search. In *United States v. Clay,* for example, the court found it appropriate for an officer to retrieve an arrestee's shoes.

> Because Clay was still barefoot, Officer Sherry Cone asked where his shoes were located. Clay indicated that they were in the bedroom, and Officer Cone returned to the bedroom to retrieve them. In the bedroom, Cone noticed a bag of marijuana sitting in an unfilled aquarium on the table near the bed where Clay was found.

408 F.3d 214, 217 (5th Cir. 2005). The court found, without much elaboration, that "the need to procure footwear for Clay constituted exigent circumstances justifying Officer Cone's return to the bedroom." *Id.* at 218. And in *United States v. Titus,* the court found it reasonable for agents "to find some clothing for Titus rather than take him nude to FBI headquarters on a December night," and so the evidence they found while looking for clothing was "properly seized under the 'plain view' doctrine." 445 F.2d 577, 579 (2d Cir. 1971).

Allowing police to take a nearly naked person into custody would offend the dignity of arrestees and could give rise to health and sanitary concerns as well. *Rivera v. Bates,* No. CIV 12-0473 JB/RHS, 2014 WL 3421050, at *52 (D.N.M. June 21, 2014 ) (noting that the defendant arrested wearing only boxer shorts endured "greater than the general

embarrassment arrestees experience during a normal arrest."); *United States v. Nascimento*, 491 F.3d 25, 50 (1st Cir. 2007) ("When police encounter and arrest a partially clothed individual in his home, the need to dress him may constitute an exigency justifying the officers in entering another room in order to obtain needed clothing. . . . It suffices to say that both human dignity and the New England climate counseled here in favor of a more complete wardrobe.").

Whether analyzed under exigent circumstances or the plain-view doctrine, or whether obtaining clothing is simply concomitant with the requirements of basic human decency and dignity, courts recognize that in some cases the police cannot place someone into custody "as is"—the individual might need clothing for decency or warmth purposes, or perhaps he might need some kind of medication crucial to his survival. In appropriate circumstances, this reality grants police reasonable leeway in securing clothing or other needed items for the defendant. Notably, Phipps has never suggested what the police should have done instead. Take him into custody in a near-naked state? Find the nearest Wal-Mart and buy him some new clothes, rather than use the clothes they saw at the foot of the bed? Neither choice would be reasonable under the circumstances.

Phipps believes the clothing search was pretextual because it was law enforcement's idea to find his jeans rather than Phipps', and because they did not deliver the jeans to Phipps immediately. But this assertion is far too cynical; it also ignores the context of the situation and relies on the spurious 20/20 vision of hindsight. Recall that officers were there to apprehend a known felon, a fugitive on the run from a federal warrant. They were at Retic's home to get Phipps, not to find additional evidence. On top of this, they had already seen the gun in plain view, and so it's even more of a stretch to believe they then trumped up a phony

need to obtain Phipps' jeans so that they could search them on the off chance they contained more contraband. And recall that Deputy Loesch was already in the bedroom where the jeans were located. He wasn't using the search as some kind of pretext to gain entry somewhere else; he was simply picking up what appeared to be Phipps' jeans. Finally, the fact that it was not Phipps' idea to get the jeans is of little moment—either way, officers could subject themselves to liability for violating Phipps' dignity if they did not provide adequate clothing for their arrestee. As Professor LaFave notes, "it does not seem at all unreasonable for the police to require the defendant to don street clothing, without regard to his wishes." 3 Wayne R. LaFave, Search and Seizure § 6.4(a) (6th ed. 2020).

It would be another matter if there were evidence that officers ransacked Retic's home to find clothing for Phipps when his own clothes were obviously lying right there on the floor. But that's not what happened. The more mundane facts are simply that Phipps was wearing only boxer shorts and that the rest of his clothes were on the floor next to the bed the police found him in. Loesch testified credibly that when he "asked about clothing for him on our radios," he was told that Phipps' clothing was at the foot of the bed. Tr. I at 157. "I did a visual look at the foot of the bed. I identified, I believe, a T-shirt and a pair of jeans, lighter colored sone-washed jeans." *Id.* Engaging in a bit of overkill, Loesch then apparently radioed back to *confirm* that the clothes he saw at the foot of the bed were Phipps' clothes. (Given that Phipps was dressed only his boxers, and Loesch saw a men's T-shirt and jeans on the floor of a woman's bedroom, it wasn't a huge leap of logic to conclude they were Phipps'.) There was a bit of a delay in getting confirmation, and so Loesch went ahead with the search, "seeing [as] those were the only male clothes at the foot of the bed." *Id.* at 156-57. That he even asked

23

if the clothes were Phipps' demonstrates that Loesch was operating in good faith rather than drumming up a pretextual reason to search the jeans.

Officers had arrested a nearly naked man and spotted his jeans on the ground. Before providing them to Phipps to wear, Deputy Loesch reasonably searched them. That the jeans contained contraband is unfortunate for Phipps, but it does not give rise to a constitutional violation under these facts.

### III.    Conclusion

The arrest warrant authorized law enforcement to apprehend Phipps at his own house, or at the home of anyone else, so long as they had probable cause to believe he would be located in that place. Law enforcement had ample reason to believe he would be found at the home of Santana Retic. Accordingly, the arrest was lawful as to Phipps himself, which means any evidence obtained against him was obtained lawfully under the plain-view doctrine and the need to clothe Phipps. I therefore recommend that the motion to suppress, ECF No. 20, should be **denied**.[8]

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this recommendation or prior to the final pretrial conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the district judge in writing.

---

[8] I agree with Phipps that if the arrest were unlawful, the consent provided by Retic would have been tainted by the unlawful arrest even if the consent were deemed voluntary. *United States v. Robeles-Ortega*, 348 F.3d 679, 683 (7th Cir. 2003). Therefore, the inevitable discovery doctrine would not apply.

Dated this 21st of September, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge