UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Case No. 22-cr-265-pp

   v.

MARKEITH D. PHIPPS,

        Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 61), ADOPTING JUDGE DRIES'S REPORT AND RECOMMENDATION (DKT. NO. 52) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 20)**

On September 9, 2022, police officers arrested defendant Markeith Phipps under a valid arrest warrant issued after he failed to appear to serve a revocation sentence in another case. The defendant, who was a fugitive at the time, was found sleeping in the home of Santana Retic. After discovering the defendant and Retic in bed, the police saw a firearm in plain sight next to the bed; they later recovered drugs from the pocket of the defendant's pants. That evidence led to the indictment in this case.

The defendant argues that the law enforcement officers' entry into Retic's home was illegal and moves to suppress the evidence. Dkt. No. 20. The defendant argues that "the seizing officers (1) unlawfully entered [Retic's] residence without reasonable belief that [the defendant] resided there and was

1

present at the time of entry; and (2) unlawfully seized evidence during the course of an unjustified search subsequent to his arrest." Id. at 1.

After holding  a two-day evidentiary hearing and considering the parties' briefs, Magistrate Judge Stephen C. Dries recommended that this court deny the suppression motion because the police had probable cause to believe the defendant would be located at Retic's home, because the defendant's gun was found in plain view during a lawful entry and seizure and because the drugs were found in the defendant's pants pocket, which the officers reasonably retrieved so that the defendant had something to wear. Dkt. No. 52. The defendant timely objected. Dkt. No. 61.

The court will overrule the defendant's objections, adopt Judge Dries's recommendation and deny the defendant's motion to suppress the evidence.

## I.  Standard for District Court Review of a Report and Recommendation

Federal Rule of Criminal Procedure 59(b) governs a district court's referral of motions to suppress to magistrate judges. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation to a motion to dismiss. Federal Rule of Criminal Procedure 59(b)(2). The district judge must review de novo the portions of the magistrate judge's recommendations to which a party timely objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1).

2

## II. Procedural Background

### A. Pre-Hearing Arguments to Judge Dries

#### 1. *Defendant's Initial Brief* (Dkt. No. 20)

In his initial brief, the defendant explained that in searching for the defendant, law enforcement officers developed information that he was staying at 3281 North 1st Street in Milwaukee. Dkt. No. 20 at 2. He contended that his counsel learned that the government believed the officers had developed this information by reviewing information obtained through execution of a warrant on Facebook's parent company. Id. at 3. Counsel said that among the thousands of pages of records produced there were less than 200 involving a Santana Retic. Id. One of those was a July 27, 2022[1] message from Retic to the defendant saying, "Bring your ass home." Id. The defendant asserted, however, that he never had lived with Retic. Id. at 4. He said that at the time he was arrested, he was living with his fiancée, Krystynn Taylor, at an address on North 50th Street. Id. Defense counsel represented that he had learned from Taylor that the defendant was at the North 50th Street residence more than 95% of the time, and that while he lived there, he would park his car—a Mercedes-Benz sedan—on a slab visible from the street. Id.

Defense counsel asserted that Retic rented the property on North 1st Street, that only she and her two sons were on the lease, and that she'd told law enforcement that the defendant would occasionally visit her there. Id. at 5.

---

[1] This message was dated about a month and a half before the defendant's September 9, 2022 arrest.

3

Defense counsel stated that Retic told officers that she had an intimate relationship with the defendant and that he would visit her one to two nights at a time. Id. Counsel said that Retic told the defense investigator that the defendant never had had a key to Retic's home or kept clothes or belongings there, and that when he visited, he had to get permission in advance. Id. Counsel also stated Retic told the defense investigator that before the day of the defendant's arrest, she had not seen him for more than a week and that he wasn't staying at her home "around the time of the encounter." Id. Retic told the defense investigator that on the morning of the arrest, the defendant had called Retic to ask if he could "crash" at her place," that she had agreed and that the defendant had let himself in through an unlocked door at about 7:00 a.m. Id.

The defense brief then described the events of the arrest—officers arriving at the North 1st Street residence, seeing a Mercedes sedan (registered to the defendant) parked on the street, knocking, entering the residence and finding the defendant and Retic in a second-floor bedroom. Id. at 6-7.

In the initial brief's legal analysis, the defendant argued that the officers "(1) unlawfully entered [Retic's] residence . . . ; and (2) unlawfully seized evidence during the course of an unjustified search subsequent to his arrest." Dkt. No. 20 at 1. The defendant asserted that to enter Retic's residence, the officers needed—but lacked—probable cause to believe (1) that the defendant resided at Retic's residence and (2) that he was inside the residence at the time of the search. Id. at 11-13 (citing Payton v. New York, 445 U.S. 573 (1980);

4

United States v. Jackson, 576 F.3d 465 (7th Cir. 2009); and United States v. Brinkley, 980 F.3d 377 (4th Cir. 2020)). The defendant argued that while the "officers may have suspected that [the defendant] occasionally stayed at Retic's," "they lacked probable cause to believe he *resided* there." Id. at 14 (emphasis in original). And he argued that the officers "found even fewer indications that [he] was currently present within the residence" at the time of the search. Id.

The defendant next argued that law enforcement unlawfully seized the gun and the drugs found inside Retic's home. Dkt. No. 20 at 15. He contended that the plain view exception to the warrant requirement "doesn't apply here because the . . . officers weren't entitled to enter Retic's residence in the first place." Id. at 17. He asserted that the protective sweep exception to the warrant requirement didn't apply, not only because the officers' "entry into the home . . . was unlawful," but "because the officers had already secured the residence prior to searching it." Id. at 17-18. Finally, the defendant argued that the consent exception to the warrant requirement didn't apply because Retic's consent was invalid. Id. at 18-20.

The defendant ended his initial brief by informing the court that, after conferring with the government, he believed that "both parties anticipate that a[n] [evidentiary] hearing will be necessary." Dkt. No. 20 at 21.

2. *Government's Pre-Hearing Response* (Dkt. No. 24)

The government responded that the parties agreed that "as of September 9, 2022, there was a valid outstanding arrest warrant for [the defendant], a

5

convicted felon who had failed to appear to serve a revocation sentence imposed by this [District] Court." Dkt. No. 24 at 2. It recounted that the parties agreed that the officers "executed that warrant on the morning of September 9th at around 9:25 AM at the home of [Retic] in Milwaukee, Wisconsin." Id. The government argued that "the evidence will show that [the] officers had probable cause to believe that [the defendant] would be located at [Retic's] residence on the morning of September 9, 2022, when they approached and entered the residence." Id. at 3. It asserted that the officers "were lawfully present when they observed a firearm in plain view next to [the defendant's] bed at the time of his arrest, and there is no basis for suppressing the firearm." Id. at 3-4. The government argued that Retic's consent to the search of her residence was valid, and therefore that the drugs found in the defendant's pants pockets "would inevitably have been discovered, even if their actual discovery in the course of locating suitable clothing for [the defendant] is somehow deemed unreasonable." Id. at 4.

The government closed its response by opining that an evidentiary hearing would be necessary to flesh out "(1) the extent of the information developed by law enforcement about [the defendant's] whereabouts prior to executing the arrest warrant at [Retic's] address; (2) the circumstances surrounding the discovery of drugs in [the defendant's] pants; and (3) the nature of the interview culminating in [Retic's] consent to search." Id. at 4-5. The government asked "that the court conduct an evidentiary hearing; after

6

which the government anticipate[d] asking the court to deny the motion in all respects." Id. at 6.

B.  Evidentiary Hearing

Judge Dries scheduled an evidentiary hearing. Testimony commenced on the morning of April 25, 2023 with the government calling Kristina Langteau, the defendant's supervising probation officer during his federal supervised release. Dkt. No. 33 at 6-7. Langteau testified to messages the defendant had sent her after his supervised release was revoked and his self-surrender period had expired, resulting in his fugitive status. Id. at 10-14. She explained that she gave the messages to the U.S. Marshals Service to assist them in their search for the defendant. Id. at 14-18. After Langteau's testimony, the government called Deputy U.S. Marshal Todd Marratt, who initially was the deputy in charge of locating the defendant after he had become a fugitive. Id. at 29-30. Marratt testified about the government's early efforts to locate the defendant. Id. at 30-38.

The government next called Deputy U.S. Marshal Kevin Smith, who received the case from Marratt. Id. at 48-52.[2] Smith explained the steps he took to find the defendant, which included applying for, receiving, and executing a warrant to search the non-public aspects of the defendant's Facebook account, surveilling the residences that the defendant was believed to frequent at the time and executing the arrest warrant at Retic's residence. Id.

---

[2] There is an excerpt of Deputy Smith's April 25, 2023 evidentiary hearing testimony docketed separately at Dkt. No. 29; that excerpt mistakenly refers to the date of Smith's testimony as April 26, 2023.

at 52-66. Prior to re-direct of Smith, the defense asked to call Retic's mother, Josie Mallette, because of her work schedule. Id. at 110-111. The government didn't object, id. at 111, and Mallette, who was living with her daughter and present on the morning of September 9, 2022, testified to her recollection of the morning of September 9, 2022, id. at 111-118, 121-124. Smith then resumed the stand (id. at 125) for a brief redirect by the government (id. at 125-131), cross by the defense (id. at 131-137) and another redirect from the government (id. at 137-138). Day one wrapped up with testimony from Chief Deputy U.S. Marshal Jeremy Loesch—who supervised the execution of the arrest warrant at Retic's residence (id. at 138-183, 184-213)—and Officer Jake Leannais, one of the officers who assisted in executing the arrest warrant (id. at 213-237).

The evidentiary hearing continued the morning of May 1, 2023, beginning with testimony from Krystynn Taylor, the defendant's fiancée. Dkt. No. 34 at 7. Taylor testified about her relationship with the defendant and the residence they shared. Id. at 7-61. Taylor was followed by Linda Phipps, the defendant's mother, who testified to her recollection of the events on the morning of her son's arrest. Id. at 62-78. After the government finished its cross of Phipps, Retic's son took the stand to testify to his recollection of the morning the arrest warrant was executed. Id. at 78-86. Retic took the stand next and the parties conducted two rounds of direct and cross examination. Id. at 86-147. The defense rested. Id. at 147. The day wrapped up with testimony from the government's rebuttal witness, Milwaukee Police Officer Bryon Downey, who testified about his role in the defendant's arrest. Id. at 148-179.

8

After Downey's testimony, the government advised the court that it potentially had more witnesses. Id. at 179-180. The court continued the evidentiary hearing to May 19, 2023. Id. at 182. But on May 16, 2023, the parties filed a joint status report, explaining that they had conferred and agreed that neither the government nor the defense would call additional witnesses. Dkt. No. 30. The parties proposed that the court set a schedule for post-hearing briefing, in which the defendant would supplement his initial brief, the government would respond and the defendant would reply. Id. at 1-2.

C.     Post-Hearing Arguments to Judge Dries

1.     *Defendant's Supplemental Brief* (Dkt. No. 43)

In his post-hearing, supplemental brief, the defendant argued that the government could not show that the officers had probable cause to believe that the defendant *resided* at Retic's residence and would be present at Retic's residence on the morning of September 9, 2022. Dkt. No. 43 at 14. He contended that at the time the officers entered Retic's residence, Smith—the deputy U.S. Marshal conducting the investigation into the defendant's whereabouts—"only had two sources of information connecting [the defendant] to [Retic's] address." Id. Those were "(1) the Facebook messages [between him and Retic]; [and] (2) the presence of one of [his] cars." Id. (citing Dkt. No. 33 at 109).

The defendant argued that these two sources did not support the conclusion that the officers had probable cause to believe he resided at Retic's residence. He asserted that "given [his] Facebook communication with other

9

women, it was just as likely—if not more—that [he] was transient, spending his time at different women's' homes without residing at any of them." Dkt. No. 43 at 14. He argued that "the nature of his communications with Retic herself . . . suggested that he was not residing there, but merely visiting." Id. The defendant stated that "the Facebook materials included videos . . . suggest[ing] that he was not residing [at Retic's residence], but merely visiting." Id. He argued that the presence of his car was equally unhelpful, given that "the Mercedes was just one of the many vehicles associated with [him]." Id. 14.

The defendant next argued that the officers lacked probable cause to believe that he was present at Retic's residence on the morning they executed the arrest warrant. He contended "that any supposed confirmation from [Retic's son] as to [the defendant's] presence" could not be considered because Retic's son already had been ordered to exit the residence when the officers entered it. Dkt. No. 43 at 15-16. But assuming Retic's son's "supposed confirmation could be taken into consideration for purposes of this probable cause determination," the defendant argued that "the government cannot meet its burden to establish that this confirmation was actually provided." Id. at 16. The defendant next argued that the fact that his "Mercedes was parked out front is insufficient to establish probable cause as to presence" because the car "had a flat tire and expired registration," suggesting that it "could have been left there days or even weeks ago." Id. He suggested that it might have occurred to the officers that he "lent the car to Retic" or that he "could have been parked there but out in the neighborhood, another nearby house, or elsewhere." Id.

Finally, the defendant argued that the officers couldn't rely on the information gained from the Facebook warrant because that warrant was stale when the officers executed it. The defendant pointed out that the Facebook search warrant approved by Magistrate Judge Nancy Joseph on August 17, 2022 stated: "you are commanded to execute this warrant on or before September 1, 2022." Dkt. No. 43 at 17-18 (citing Dkt. No. 43-1 at 2). The defendant asserted that despite that fact, "Smith testified that he executed the warrant and received a response from Facebook on September 2, 2022." Id. at 18 (citing Dkt. No. 33 at 61). "Thus," the defendant argued, "the [Facebook] materials produced in response to that [stale] warrant and any derivative evidence obtained by use of those materials should be suppressed as fruit of the poisonous tree." Id.

2. *Government's Post-Hearing Opposition* (Dkt. No. 48)

The government agreed with the defendant that for the officers' entry into Retic's residence to be lawful, the officers needed probable cause to believe that (1) the defendant resided there and (2) he would be found there on the morning of the search. Dkt. No. 48 at 15-16 (citing Payton, 445 U.S. 573). The government argued that the officers had probable cause to believe both of those things. It asserted that the officers had probable cause to believe that the defendant lived at Retic's address because the defendant "had not been observed at his mother's house or Taylor's house, and indeed he had declared that he would not be located at any known address." Dkt. No. 48 at 17. The government argued that the investigation had uncovered "[the defendant's]

11

relationship with Retic, and the Facebook exchange in which she admonished [him] to 'bring his ass *home*,' referring to [her] residence." Id. (emphasis added). The government pointed out that "there was surveillance two days prior to [the defendant's] arrest and on the date of the arrest putting [him], through his Mercedes, at [Retic's] address." Id.

The government argued that the officers also had probable cause to believe that the defendant would be found at Retic's residence on the morning of September 9, 2022. Dkt. No. 48 at 19. It pointed out that Deputy Smith had "observed the Mercedes parked directly in front of the house early in the morning [of the defendant's arrest] (as he had several days prior)." Id. at 19. It asserted that the officers also "had . . . confirmation of [the defendant's] presence from an occupant of the house before they entered." Id. (citing Dkt. No. 34 at 85, 151-152). The government contended that the officers' entry into Retic's residence was lawful, and that because the entry was lawful, it followed that the gun discovered in plain view was lawfully seized.

As for the drugs found in the defendant's pants, the government argued that the warrantless search of the pants "was reasonable in light of [the defendant's] near-nakedness and the need to transport, process, and detain him safely following his arrest." Dkt. No. 48 at 21. The government maintained that the defendant "had 'a substantial need for the clothing and . . . the government's response was limited strictly to meeting that need.'" Id. at 22. It explained, "While *locating* the defendant's clothing was primarily undertaken for the defendant's benefit, *searching* the clothing was primarily a measure to

12

protect the officers and others during the defendant's imminent transport downtown and his anticipated stay in the Marshal's 'lock up.'" Id. at 23 (emphasis in original) (citing Dkt. No. 33 at 158). The government argued that "it was eminently reasonable to attempt to find clothing for a near-naked defendant, and to search that clothing before giving it to him." Id.

        3.    *Defendant's Post-Hearing Reply* (Dkt. No. 51)

The defendant reiterated his argument that the two sources on which the officers relied for probable cause—the Facebook messages between himself and Retic and the presence of his car outside the residence—were insufficient. Dkt. No. 51 at 5. He pointed out that certain Facebook messages showed him asking Retic for permission to come over, which "runs counter to any notion that [he lived at Retic's] home." Id. at 6. And he argued that his messages with other women "are similar [to his messages with Retic] in every meaningful respect"— yet the Marshals appeared to have disregarded those messages in investigating his whereabouts. Id. at 7. Regarding the presence of his Mercedes, the defendant pointed out that the only one of his cars that "produced any ALPR (automatic license plate reader hits was [his] Honda;" the defendant asserted that this fact suggested that the defendant "was primarily driving the Honda at that time" and so "the presence of the Mercedes wasn't as indicative of residence." Id. at 8.

The defendant asserted that the officers hadn't confirmed that Retic lived at the address. Id. at 9. He argued that the only thing connecting Retic to the address was her driver's license and that the officers didn't verify that

information. Id. He said that the officers failed to adequately investigate his whereabouts before "zeroing in on Retic, rushing to her home, and forcing entry at gunpoint." Id. The defendant argued that lack of resources did not excuse the failure to investigate. Id. He contended that the officers disregarded his frequent communications with women other than Retic, Facebook videos of him at other residences, ALPR hits on the Honda at other residences, the expired registration of the Mercedes, the fact that the Mercedes had a flat tire, videos of him in other cars, and messages where the defendant asked Retic for permission to visit (implying that he didn't live with her). Id. at 10. The defendant argued that the import of the Mercedes being located outside Retic's home was undercut by (1) the fact that he was never seen in the car, (2) the fact that the car's registration was expired, making it unlikely that he would drive it while a fugitive seeking to evade law enforcement, (3) the possibility that the car could have been dropped off for Retic to use and (4) the possibility that he could have been away from the car and wasn't in the house, but somewhere else. Id. at 11-12.

The defendant next argued that there was no exception to the warrant requirement that would have allowed the officers to seize and search the defendant's pants. The defendant asserted that the government's "clothing exigency" exception argument failed because the Seventh Circuit hasn't recognized such an exception. Dkt. No. 51 at 14-15. He argued that even if the Seventh Circuit had recognized such an exception to the warrant requirement, the exception does not apply because the search for clothes was clearly pretext

14

for conducting a warrantless search. Id. at 15. He pointed out that he never asked for clothes and that Deputy Loesch's testimony revealed that he had searched the pants before he confirmed they belonged to the defendant. Id. The plaintiff maintained that he was outside for a lengthy period before officers started discussing his clothing. Id.

The defendant argued that there was no exception to the warrant requirement allowing an officer to stay in a building for the purpose of checking a defendant's criminal history (as one of the deputy marshals testified he had done). Id. at 16. He asserted that the officers could have checked the defendant's criminal history while outside, or even before the entry into Retic's residence. Id.

The defendant maintained that the inevitable discovery doctrine did not apply, because Retic's consent to search was not voluntary; the defendant accused deputy marshal Loesch of false testimony in that regard, asserting that Retic's testimony was more credible. Id. at 16-17. The defendant maintained that the inevitable discovery doctrine required "more than what [the government had established] here." Id. at 18. He asserted that for the inevitable discovery doctrine to apply, the government must show "why, in light of the unlawful forced entry here, a magistrate would've certainly granted a search warrant after the officers had already seized the firearm they found in plain view." Id. at 19. He asserted that the government only "hypothesized" that the officers would have obtained a search warrant under the circumstances of this case. Id. 20. He then returned to the question of Retic's consent, arguing

15

that "Retic's (involuntary) consent wasn't sufficiently attenuated from the officers' unlawful entry." Id. at 20-21.

Finally, the defendant reiterated his contention that law enforcement had executed a stale search warrant, insisting that "the officers couldn't rely on information gained from materials produced by Meta (Facebook) because the warrant for those materials was stale at the time they executed it." Id. at 21-22.

D.     Judge Dries's Report and Recommendation (Dkt. No. 52)

Judge Dries's twenty-five-page report recommends that the court deny the defendant's motion to suppress in its entirety. Judge Dries framed the question as "whether the subject of an arrest warrant can object to the absence of a *search* warrant when evidence against him is found when he is arrested in someone else's home." Dkt. No. 52 at 7. He began by discussing the teachings of Payton—that "sometimes an arrest warrant—rather than a search warrant— will suffice." Id. He discussed the Supreme Court's holding in Steagald v. United States—that "a search warrant *would* be required to enter the home of a third party to arrest a suspect." Id. (citing Steagald, 451 U.S. 204, 213-14 (1981)). Judge Dries then said,

> There is some understandable confusion about the appropriate analysis to apply in this case. Anyone reading *Payton* and *Steagald* together could be forgiven for believing that *Steagald* always requires a search warrant to enter a third party's home, and that *Payton* provides a workaround if the government can show that police reasonably believed the suspect (1) lived in the residence where he was arrested and (2) would be found at that location at the time of arrest. *Payton*, 445 U.S. at 603 ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.") This is certainly how both sides have

16

approached and briefed this case: the government argues both that (1) [the defendant] resided with Retic and (2) he was likely to be found there at the time of the arrest, and the defendant vigorously contests both points.

Unfortunately, the two-part framework proposed by the parties gives rise to substantial tension within traditional understandings of the Fourth Amendment. Courts have held repeatedly that a person's home is where he is entitled to the *greatest* protections against government intrusion. *See, e.g., Payton*, 445 U.S. at 585. And so it might reasonably be asked: why would we apply a test requiring the government to argue that a suspect is at *home*, where he is entitled to the *most* protection from the government? And why does the defendant find himself arguing that he was *not* in the place where courts have found he enjoys the most protections? One would think the opposite is true.

This tension is resolved when it's understood that the two-part test proposed by the parties is not *wrong*, it's just that [the defendant] is the wrong person to be relying on it.

Id. at 8-9.

Judge Dries explained that an Eighth Circuit case, United States v. Risse, 83 F.3d 212 (8th Cir. 1996), and a district court case upon which the defense relied, United States v. Kaquatosh, Case No. 22-cr-21-WCG, Dkt. No. 27 (E.D. Wis. Mar. 28, 2022), stood "for the principle that when evidence is found against a homeowner not named in an arrest warrant, the government must establish both that police believed the subject of the warrant would be found at that home *and* that the subject resided there as well." Id. at 8-9. In other words, if the officers had found evidence against *Retic*—the homeowner—and had charged her with a crime, then "[*Retic*] could move to suppress and require the government to satisfy the two-part Payton framework." Id. But Judge Dries found that because the government is prosecuting the defendant

17

(the subject of the arrest warrant) and not Retic (the third-party homeowner), the officers did not need probable cause to believe that the defendant *lived* at Retic's residence. Id. Judge Dries concluded that the correct legal standard applicable to the facts in this case required that the officers possess (1) a valid arrest warrant and (2) "probable cause that the subject [of the arrest warrant] *would be located* at the residence they enter[ed]." Id. at 10 (citing Jackson, 576 F.3d at 469) (emphasis added).

Judge Dries found that the officers had probable cause to believe that they would find the defendant at Retic's home. He observed (1) that the defendant had told his probation officer that he would not be found at any residence already known to law enforcement, (2) that the Facebook communications between Retic and the defendant reflected an intimate relationship and (3) that the officers spotted the defendant's Mercedes Benz parked outside Retic's home both on the morning of his arrest and two days prior. Dkt. No. 52 at 14-18. Judge Dries summed up his probable cause analysis as follows: "when police know a fugitive is not at his typical places of residence, and when they spot one of his cars parked at the home of a woman with whom he has a relationship, common sense dictates that the fugitive would probably be located in that home." Id. at 18.

As for the defendant's contention that the Facebook warrant was stale or invalid when Deputy Smith executed it, Judge Dries observed that the warrant had been issued on August 17, 2022 and had an execution deadline of September 1, 2022, id., and acknowledged that the warrant's return indicates

18

that it was "executed" on September 2, 2022 at 3:20 pm, id. at 18-19. But Judge Dries observed that there was no testimony about when the warrant actually was executed, and concluded that the September 2 execution date on the warrant seemed "impossible on its face," given that the return also indicates that law enforcement received the Facebook records on September 2, 2022 and that it was "common knowledge and experience that Facebook (Meta) and other companies do not routinely—or *ever*—provide responses to warrants on the *same day* the warrant is executed." Id. at 19 (emphasis in original). Judge Dries explained:

> This is especially true given that the return says the warrant was "executed" at 3:20 p.m. on September 2, close to the end of the business day on the Friday heading into the Labor Day weekend. If [the defendant] is right, then Facebook received the warrant at 3:20 and then produced its records within just a few *hours*, allowing Smith to receive them that very same afternoon. That likely didn't happen. In all likelihood, Deputy Smith used the term "executed" to mean that's when he *received* the records from Facebook, not when he served the warrant on Facebook.

Id.

Judge Dries also reasoned that even if law enforcement had executed the warrant a day late, the delay would not have risen to the level of a constitutional violation "unless the probable cause dissipated before the warrant was executed." Id. at 19 (quoting Harper v. Murphy, Case No. 19-c-1822, 2020 WL 620090, at *3 (E.D. Wis. Feb. 10, 2020)). Judge Dries concluded that records reviewed in early September 2022, containing communications between mid-April and mid-August 2022, were not stale at the time they were reviewed; "[i]f the point of seeking the records was to find [the

19

defendant's] contemporaneous relationships and information about his whereabouts, then it's unlikely that information communicated on Facebook during the summer of 2022 would suddenly become stale once the clock struck midnight on September 2. It is, at most, harmless error." Id. at 20 (citing United States v. Nyah, 928 F.3d 694, 700-7701 (8th Cir. 2019)).

Judge Dries observed that the defendant had not disputed that if his seizure was valid, the seizure of the gun—which, according to uncontested testimony, was found in plain view beside the bed—was valid. Id. Thus, he concluded that "the plain view doctrine allows the seizure of the gun." Id. But Judge Dries determined that the search of the defendant's pants required further analysis. Id.

Judge Dries began by asserting that "there can be little doubt that officers may search the clothing of someone they are bringing into custody," as a matter of safety. Id. He reasoned that if the defendant had been wearing the pants, "it should be apparent that officers could have searched his jeans prior to bringing him into custody." Id. at 20-21 (citing United States v. Jackson, 377 F.3d 715, 716 (7th Cir. 2004)). The question, Judge Dries said, was "whether officers may affirmatively retrieve clothes for an unclothed individual they've just arrested (which would then allow them to search the clothes)." Id. at 21. He found that the answer to that question "seems to be 'yes,' so long as the need for clothing is reasonable and not a pretext to conduct a warrantless search." Id. at 21 (citing United States v. Clay, 408 F.3d 214, 217 (5th Cir. 2005); United States v. Titus, 445 F.2d 577, 579 (2d Cir. 1971); Rivera v.

20

Bates, No. CIV 12-0473, 2014 WL 3421050, at *52 (D.N.M. June 21, 2014);

United States v. Nascimento, 491 F.3d 25, 50 (1st Cir. 2007)).

Judge Dries explained:

> Whether analyzed under exigent circumstances or the plain-view doctrine, or whether obtaining clothing is simply concomitant with the requirements of basic human decency and dignity, courts recognize that in some cases the police cannot place someone into custody "as is"—the individual might need clothing for decency or warmth purposes, or perhaps he might need some kind of medication crucial to his survival. In appropriate circumstances, this reality grants police reasonable leeway in securing clothing or other needed items for the defendant. Notably, [the defendant] has never suggested what the police should have done instead. Take him into custody in a near-naked state? Find the nearest Wal-Mart and buy him some new clothes, rather than use the clothes they saw at the foot of the bed? Neither choice would be reasonable under the circumstances.

Id. at 22.

Judge Dries dismissed as "far too cynical" the defendant's arguments that the clothing search was pretextual. Id. at 22-23. He characterized the defendant's assertion that it was the officers' idea to find his jeans, and the assertion that they didn't give the defendant the jeans right away, as relying "on the spurious 20/20 vision of hindsight." Id. Judge Dries recounted that the reason the officers were in Retic's home was to apprehend a known felon who was a fugitive avoiding a federal warrant, and observed that they were at Retic's home to find the defendant, not to find evidence. Id. He recounted that the officers already had seen a gun in plain view, and questioned why officers would need to "trump up" a false need to obtain the defendant's jeans to search them in the hope of finding more contraband. Id. at 22-23.

21

Judge Dries conceded that "[i]t would be another matter if there were evidence that officers ransacked Retic's home to find clothing for [the defendant] when his own clothes were obviously lying right there on the floor. But that's not what happened." Id. at 23. He explained that officers had found a man wearing only boxer shorts, and had found the rest of his clothes on the floor next to the bed in which the officers found that man. Id. He concluded that "[o]fficers had arrested a nearly naked man and spotted his jeans on the ground," reasonably searching them before turning them over to the defendant so he had something to wear. Dkt. No. 52 at 24. "That the jeans contained contraband is unfortunate for [the defendant], but it does not give rise to a constitutional violation under these facts." Id.

      E.    <u>Briefing Before This Court</u>

          1.    *Defendant's Objections* (Dkt. No. 61)

The defendant "submits that [Judge Dries'] Recommendation misapplied the law and failed to account for key facts and arguments." Dkt. No. 61 at 1. As to the legal standard, the defendant asserts that Judge Dries misunderstood his legal argument. Id. at 3. While conceding that his "briefing occasionally remarked that the prudent and reasonable course of action was for the officers to seek a search warrant of Retic's home after spotting [his] Mercedes there for a second time on September 9, 2022," the defendant contends that he "never argued that the officers needed a search warrant." Id. at 4. He says that his briefs relied on <u>Payton</u>—he concedes that officers didn't need a warrant but argues that under <u>Payton</u>, the officers "needed probable cause as to both

residence and presence in the absence of a warrant." Id. He contends that Payton requires "probable cause as to (1) residence and (2) presence." Id. at 4. The defendant argues that "none of the decisions cited by [Judge] Dries[3] . . . hold that the Payton inquiry is limited to the presence prong." Id. at 5. He asserts that those cases "are inapposite because each are responding to erroneous arguments that the police needed a search warrant," the argument he says he never raised. Id. The defendant says that he is "not arguing and has not argued that his privacy or property interests in the home itself were violated—as only Retic could argue under *Steagald*—but instead that his liberty interests were violated under *Payton*." Id.

The defendant asserts that Judge Dries made a factual error in finding that Retic's teen son, A.J.L., conceded that he probably told officers that the defendant was in Retic's home. Id. at 6. The defendant asserts that not only is this finding not supported by the record, but that it is "simply false." Id. He then concedes that Judge Dries correctly recounted A.J.L.'s testimony—that A.J.L. testified that he did not confirm the defendant's presence, but also testified that he "probably" did confirm the defendant's presence. Id. The defendant says:

> As discussed in [the defendant's] post-hearing supplemental brief, A.J.L. first testified that—immediately after being escorted outside—he told officers that didn't [sic] know whether [the defendant] was in the house. A.J.L. then testified that—while speaking to an officer

---

[3] Defense counsel variously refers to Judge Dries as "Magistrate Dries" or "Dries." Judge Dries is a United States Magistrate Judge; the use of his honorific title—"Judge"—is a sign of respect for the office he holds and the court on which he sits. Defense counsel's failure to utilize Judge Dries's proper title implies a disrespect the court hopes was unintended.

who remained outside seven minutes after the other officers entered—he "probably" said that [the defendant] was in the upstairs closet. *See* dkt. 43 at 11 (discussing the issue of this testimony).

Id.

The defendant next argues that Judge Dries's analysis of whether the officers had probable cause to believe that the defendant was present in the residence at the time of entry was too limited. Id. at 7. He asserts that Judge Dries made no factual findings or legal conclusions "on the issue of whether officers had probable cause to believe [the defendant] resided at Retic's N. 1st Street home." Id. The defendant then "incorporate[d]" the arguments from his post-hearing supplemental brief and his reply brief. Id.

Next, the defendant argues that the record evidence undercuts Judge Dries's findings that the officers had probable cause to believe that the defendant would be in Retic's residence. Id. As to Judge Dries's conclusion that the Facebook communications between the defendant and Retic reflected an intimate relationship, the defendant argues that the three Facebook messages Judge Dries mentioned did not demonstrate "that [the defendant] was living at or would be found at Retic's home." Id. at 8. He recounts several messages that, he argues, show that the defendant was *not* living with Retic and was *not* in an intimate relationship with her. Id. at 8-9. He also recounts messages between the defendant and other women which appear to reflect that he has intimate relationships with those women. Id. at 9. He says that Retic's language was not meant to convey that the defendant was "her most important relationship." Id. He strenuously maintains that the evidence does not

24

demonstrate that the defendant was living with Retic. Id. at 10. He disputes Judge Dries's characterization of a photo as "intimate. Id. at 10-11.

The defendant disagrees with Judge Dries that the number of cars registered to the defendant was a red herring. Id. at 11. In the defendant's view, the fact that someone has five cars makes it less likely that that person will be in the vicinity of one of those cars at any given time. Id. He argues that the number of cars he owned "increases the likelihood that he lent the Mercedes to Retic," because the defendant could have lent Retic a car and still had other cars he could use. Id. at 12. The defendant asserts that Judge Dries dismissed the ALPR data showing "hits" on the Honda Odyssey in late July and in early and mid-August, while there were no hits on the Mercedes. Id. at 12. The defendant speculates—characterizing it as "common sense and experience"— that "when someone owns multiple cars, the prominence of a vehicle on social media is likely inversely correlated with the rate at which the vehicle is driven because of a desire to protect the vehicle from damage and depreciation." Id.

Returning to the testimony of Retic's teenaged son, the defendant again asserts that Judge Dries's conclusion that A.J.L. confirmed to officers that the defendant was at Retic's home "is entirely unsupported by the record." Id. at 12-13. He asserts that the officers encountered A.J.L. "only after crossing into the curtilage of Retic's home and demanding the occupants to exit the residence," and that officers stepped inside the doorway of Retic's home before A.J.L. came out. Id. at 13. The defendant argues that this means that A.J.L.'s

25

confirmation that the defendant "probably" was in Retic's home could not have provided probable cause prior to the officers' entry into the home. Id.

The defendant contends that "the officers lacked information showing that the [residence to be searched] was indeed Retic's residence in the first place or that the home was the same home Retic was living in at the time of her Facebook messages with [the defendant]." Id. He asserts that Judge Dries "never addressed these arguments and made no findings of fact relevant to them." Id.

The defendant takes issue with Judge Dries's conclusion that it was reasonable for law enforcement to rule out the addresses of Linda Phipps and Krystynn Taylor. Id. at 14. He says Judge Dries based this conclusion on the officers' "sporadic and infrequent drive-by surveillance" and the defendant's statement to his probation officer that he wouldn't go to any address to which he'd written while in prison or that probation had on file. Id. The defendant argues that this finding ignores "the dozens of live videos [the defendant] broadcast from inside and outside those [other] residences during his fugitive period," and lists videos between May 8 and July 18. Id. The defendant says the videos "cut against the idea that the officers reasonably ruled out the known address of [the defendant's] mother and fiancée." Id. at 15. He says that when Deputy Marshal Smith received the videos, he should have "returned to those addresses or sought additional information on those addresses through use of other investigative methods, such as geofence warrants," rather than "zero[ing] in on Retic and her unconfirmed N. 1st Street address." Id.

26

The defendant asserts that Judge Dries relied on an "unrecognized 'clothing exigency' exception to the warrant requirement" in finding the search of the defendant's pants reasonable. Id. He argues that, contrary to Judge Dries's conclusion, the officers *did* take him into custody in a near-naked state; he says that the officers sat him "outside dressed in nothing other than his boxer shorts," and that they kept him there "for several minutes before removing him to a van," at no point bringing him his shoes—which he asked for—and bringing him his pants only when they "booked him into custody much later." Id. He also disputes Judge Dries's assertion that the officers didn't ransack Retic's home when looking for evidence before searching the pants. Id. He says that "photographs . . . of Retic's bedroom show clothes strewn about, drawers emptied, and belongings scattered." Id. (citing Dkt. No. 34 at 105-106). Finally, he points out that a video shows Deputy Loesch exiting the residence several minutes after the defendant's arrest, "sweating as if he had just exerted himself," which the defendant claims suggests that Loesch had been "searching the home for additional evidence." Id. at 16.

2.  *Government's Response* (Dkt. No. 64)

The government argues that "Judge Dries has set forth a compelling argument that, in order to execute a valid arrest warrant at a third-party residence, officers need only have probable cause to believe that the subject of the warrant will be located there." Dkt. No. 64 at 3. It points out that "[t]he Supreme Court has not squarely addressed the question of what Payton requires when the subject of an arrest warrant is located at a third-party

residence." Id. at 4. The government explains that "[w]hen briefing this issue previously, the government assumed, conservatively, that Payton required a two-part test." Id. It acknowledges that Jackson, 576 F.3d at 468, and United States v. Bohannon, 824 F.3d 242, 251 (2d Cir. 2016), support Judge Dries's view that Payton's residence prong does not apply where, as here, the party moving to suppress was the subject of an arrest warrant and not the third-party homeowner. Id. The government nonetheless argues that "[i]f the relevant legal test has two prongs, . . . the Court should find that the [residence] prong is satisfied on the facts of this case." Id. at 6.

The government next argues that the officers had probable cause to believe the defendant was present at the North 1st Street address on the morning of his arrest. It calls Judge Dries's finding on this point "a common-sense conclusion, rooted in the officers' observations." Dkt. No. 64 at 6-7. It points out that "Deputy Smith saw a car associated with [the defendant]" "parked in front of [Retic's] residence, days before the arrest . . . and again early on the morning of the arrest," and that this was the car that the defendant had "featured prominently" on his Facebook page. Id. at 7. It recounts that the officers had a Facebook message between the defendant and Retic in which Retic told the defendant to bring his "ass home." Id. It observed that the defendant had told his probation officer "that he would not be found at any known addresses," and it argued that the officers' "surveillance" of those "known addresses" "tended to confirm that declaration." Id. This evidence,

28

taken together, gave "a strong indication both that [the defendant] was residing [at Retic's residence] and would be found there the morning of the 9th." Id.

The government argues that the court should adopt Judge Dries's "analysis of the search of [the defendant's] pants *in toto*," arguing that "[i]t was reasonable to locate clothing for a partially clothed arrestee and then to search that clothing for contraband, as the cases previously cited by the government establish." Dkt. No. 64 at 11 (citing Dkt. No. 48 at 21-23). The government also asserts that, although Judge Dries didn't say much about it, Retic knowingly and voluntarily consented to the search of the residence, and thus that the drugs in the defendant's pants pocket inevitably would have been discovered. Id.

### 3. *Defendant's Reply* (Dkt. No. 67)

In reply, the defendant asserts that "[a]rmed only with [a single] Facebook message, the investigating officers met and decided that they had enough to effectuate an arrest warrant" at a home that they "had no good reason to believe [the defendant] resided in." Dkt. No. 67 at 1. The defendant reiterates his belief that Payton requires the government to show that the officer had probable cause to believe that he *resided* at Retic's residence and that he would be found inside. He asserts that "[a]t no point does the [government's] response expand on the authorities cited in the Report and Recommendation on th[e] issue [of residence], nor does the response address the several cases cited by [the defendant] in conflict with the report and recommendation." Id. at 3 (citing Dkt. No. 61 at 3 n.2). The defendant argues

that this is because "the law is clear: <u>Payton</u> requires probable cause as to both presence *and* residence." <u>Id.</u> And he argues that because the government "can't establish probable cause . . . as to presence or residence," the court must issue an order granting his motion to suppress the evidence seized due to his arrest on the morning of September 9, 2022. <u>Id.</u> at 9.

**III.    Facts**

The defendant made a single factual objection to Judge Dries's report and recommendation: he contends that the report "misstates the record with regard to the officers' interaction with Retic's teenage son." Dkt. No. 61 at 6. Specifically, the defendant objects to Judge Dries's finding that at the evidentiary hearing, Retic's son "conceded that he 'probably' told the officers that [the defendant] was there." <u>Id.</u> The defendant asserts that "[t]his is not supported by the record and is simply false." <u>Id.</u>

The defense called the son as a witness at the evidentiary hearing. Dkt. No. 78 at 34. On direct examination, the son—A.J.L.—testified that in September 2022, he was living with his mother in a house on the corner of 1st and Concordia. <u>Id.</u> at 80. He testified that he was in his room when he first became aware of officers pounding on the door. <u>Id.</u> A.J.L.'s room was on the first floor of the house. <u>Id.</u> at 81. He testified that he was awake, had his earphones on and did not hear the noise at first. <u>Id.</u> A.J.L. walked to the front door, <u>id.</u>, walked out of the open door onto the porch and heard officers yelling to get out of the house, <u>id.</u> at 82. He said that no one said the defendant's name to him at that time. <u>Id.</u> He testified that when he became aware police

30

had entered his mom's house, he talked with one of the officers. Id. at 83.

A.J.L. testified that the officer asked whether the defendant was "in there," and

that he responded, "I don't know." Id.

On cross-examination, the following exchange occurred between the

prosecutor and A.J.L.:

Q.    So it's your testimony today that you never said that [the defendant] was in the house?

A.    No, I didn't say he was in the house.

Q.    You didn't say he was in the house?

A.    I said I didn't know if he was in the house.

Q.    You're saying you didn't know if he was in the house?

A.    I say he was in the house, but I really didn't know he was in the house.

Q.    So you did say he was in the house?

A.    Technically yeah in the heat of the moment.

Q.    Okay. In the heat of the moment on September 9th, you told the officers that [the defendant] was in the house.

A.    Probably.

Q.    Probably or yes?

A.    Probably.

Q.    Okay. And you knew who [the defendant] was, right?

A.    I did, but I really didn't.

Q.    Okay. I mean, you knew who he was. I'm not saying did you know him. I am saying did you know who he was?

A.    Yes.

31

Q.     And didn't you tell one of the officers that he might be hiding upstairs in a closet?

A.     Probably, probably not. I don't know.

Q.     I can play a video for you if that would help refresh your memory?

A.     I probably said that.

Q.     You knew he was in the house, right?

A.     I said I probably knew.

Q.     Probably knew. And you thought if he was since he was probably in the house that he was probably upstairs hiding in a closet?

A.     Probably. I didn't know he was in the house. I was mostly asleep.

Id. at page 84-86.

Judge Dries summed up A.J.L.'s testimony in his report:

> The same morning (September 9), Deputy Smith and about six other officers (mostly deputy U.S. marshals) converged at Santana Retic's house to arrest [the defendant]. The officers brought breaching tools, including a battering ram, and some had their weapons drawn. Soon after the officers announced their presence, Retic's teenaged son appeared and was escorted down the front steps into the yard. There is a dispute as to whether, at this point, he told officers that [the defendant] was in the house. He testified both that he "probably knew" [the defendant] was in the house and then that he *didn't* know if [the defendant] was in the house because he was "mostly asleep." Tr. II:84-85. Regardless of what he actually knew, however, he conceded that he "probably" told the officers that [the defendant] was there. *Id.* at 85

Dkt. No. 52 at 4.

The defendant's insistence that Judge Dries's summary is "false" is

concerning. Judge Dries's account reflects A.J.L.'s response to the prosecutor's

question about whether, in the heat of the moment, he told the officers that the

defendant was in the house—A.J.L. said that he "probably" did. There is nothing "false" about Judge Dries' account of that testimony, and the defendant's use of the word "false" is reckless and unwarranted.

Nonetheless, because the defendant has lodged a (meritless) objection to that part of Judge Dries's recitation of the facts, the court reproduces below the factual recitation to which the defendant has not objected—in other words, Judge Dries's factual recitation minus the paragraph summarizing A.J.L.'s testimony.[4] Judge Dries recounted:

> On April 15, 2022, Judge J.P. Stadtmueller issued a warrant for [the defendant's] arrest based on the revocation of [the defendant's] supervised release. [The defendant] failed to surrender on his own. However, he did keep in contact with his supervising probation officer, Kristina Langteau. On May 2, he texted her to inform her that he felt like he was backed against the wall and that he knew law enforcement was looking for him. Tr. I at 12. He added, "I will not go to any address I wrote in prison or that I gave you guys on file." *Id.* at 13. Langteau testified that she interpreted this to mean that [the defendant] would not be staying at either of the two addresses her office knew about already, which were his mother's house on 73rd Street and a girlfriend's house on 50th street. *Id.* at 7-9. However, she acknowledged that sometimes [the defendant] had been untruthful, for example, with respect to his drug use. *Id.* at 19.
>
> The U.S. Marshals Service apprehends federal fugitives. Deputy U.S. Marshal Todd Marratt received [the defendant's] two known addresses from Langteau. He also learned that [the defendant] had said he would *not* be found at a known address, *id.* at 15, although Langteau had not told him to categorically rule out those two addresses either, *id.* at 27. Marratt testified that he drove past the two known addresses six to eight times looking for [the defendant's] vehicles, but he never saw [the defendant] or the vehicles. *Id.* at 34. He also turned to social media to find clues about [the defendant's] location. On Facebook, he found [the defendant] posing with a Mercedes-Benz, and later learned that a Mercedes-Benz was

---

[4] Judge Dries' account refers to the day-one, evidentiary-hearing transcript (Dkt. No. 33) as "Tr. I" and the day-two transcript (Dkt. No. 34) as "Tr. II."

registered to [the defendant]. *Id.* at 36-37. Marratt also knew that [the defendant] was associated with a tow truck. *Id.* at 39.

Marratt handed the case off to Deputy Kevin Smith in July 2022. Smith testified that Marratt had told him [the defendant] was driving a silver Mercedes-Benz. *Id.* at 52. He also saw on Facebook that [the defendant's] profile picture—the first picture that people see on his page—showed him posing with the Mercedes. *Id.* at 56. Smith described the postings on the Facebook account as "frequent and recent." *Id.* Like Deputy Marratt, Smith conducted physical surveillance at the two known addresses (despite [the defendant's] statement that he would not be at either one) and came up empty. Deputy Smith also uncovered that other cars were registered to [the defendant], in particular, a 2000 Jeep Wrangler, a 2007 Infiniti, and a 2008 Honda Odyssey. *Id.* at 98.

Eventually Smith applied for and received a warrant to search the non-public parts of [the defendant's] Facebook account. The search uncovered several relationships with women, some of them of an intimate nature. *Id.* at 61. Smith focused on communications to [the defendant] made by Santana Retic, which included a photo of herself wearing a "limited amount of clothing." *Id.* at 63. In one communication, she tells [the defendant] to "bring your ass home," which Deputy Smith interpreted as meaning that both parties believed that Retic's address was "home." *Id.* at 64. There were also intimate communications from a woman named Anastasia during a similar timeframe. *Id.* at 78-81. In addition, during the same period there were frequent intimate messages to and from a woman named Sharkita. *Id.* at 82-87.

Within a few days of receiving the warrant return, Deputy Smith began surveilling Retic's home and saw [the defendant's] 2014 Mercedes-Benz parked outside the residence at approximately 1:00 p.m. on September 7, 2022. *Id.* at 64. Two days later, around 7:00 a.m., Smith again saw the Mercedes parked there. *Id.* at 64-65. In Smith's view, they'd found their man. Combined with the email from probation indicating that [the defendant] would be avoiding his known residences, the intimate Facebook messages from Retic, and [the defendant's] car being parked outside Retic's address, Smith testified that "our investigation led us to believe that this was one of [the defendant's] residences." *Id.* at 65.

The same morning (September 9), Deputy Smith and about six other officers (mostly deputy U.S. marshals) converged at Santana Retic's house to arrest [the defendant]. The officers brought breaching tools, including a battering ram, and some had their weapons drawn. Soon

after the officers announced their presence, Retic's teenaged son appeared and was escorted down the front steps into the yard. . . .

. . .

Soon after, Retic's mother left the house. She testified that she had been staying there for about three months. She might have met [the defendant] once before but generally did not keep tabs on her daughter's business and did not know [the defendant]. Tr. I:117. She also said she had no idea whether he was at the home when the police arrived. *Id.* at 118.

After Retic's mother and son left the building, police entered and began looking for [the defendant]. Once they were upstairs, officers located [the defendant] and Retic sleeping in bed. *Id.* at 153. They handcuffed both and escorted them outside. Officers also noticed a firearm in plain view. Specifically, an "AR platform pistol was immediately observed propped up on the bedpost nearest to" [the defendant]. *Id.* at 154. (Ex. 5, 6.) Chief Deputy U.S. Marshal Jeremy Loesch was the supervisor on the scene and took a few cellphone photos of the bedroom. Loesch testified that, due to the presence of the firearm, officers needed to determine whether Retic was a felon. *Id.* at 156-57. (They already knew [the defendant] was a felon.) Loesch's initial check, done on his cell phone, indicated a "CF" (criminal felony) charge on CCAP, the Wisconsin court database, which caused him to ask other officers for help determining the nature of that charge. *Id.* at 157.

After Retic and [the defendant] were escorted out of the building, Loesch remained in the bedroom, in part to find clothes for [the defendant], who had been wearing only boxer shorts. *Id.* at 156-57. An officer radioed Loesch that [the defendant's] clothes were at the foot of the bed. Loesch found a t-shirt and a pair of jeans. Loesch testified that he searched the jeans "to ensure there was no contraband inside of them because we would not want to dress a person with contraband inside their clothing and introduce that into our cell block." *Id.* at 158. The primary concern was weapons, as their transport vans were staffed by unarmed law enforcement. *Id.* While searching the jeans, Loesch uncovered a "sunglasses bag" that contained two baggies of cocaine or crack cocaine. *Id.*

Dkt. No. 52 at 1-5 (footnotes omitted).

35

**IV.    Analysis**

    A.    Legal Standard

The defendant has argued repeatedly that the applicable legal framework requires the government show that on the morning of his arrest, the officers had probable cause to believe that (1) he was inside Retic's residence *and* (2) he resided there. Judge Dries determined that only the "presence" prong of that framework—that the arresting officers had probable cause to believe the defendant was present in Retic's residence on the morning he was arrested—applies when the defendant is in a third party's residence. This court agrees.

    1.    *Payton v. New York*

The consolidated appeals in Payton v. New York "challenge[d] the constitutionality of New York statutes that authorize police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest." Payton, 445 U.S. at 574. In each of the appeals, police officers had gone to the appellant's residence to arrest the appellant on a felony charge; in each, the officers had probable cause but no warrants; and in each, they had entered the residence without consent. The Court confronted the question of "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." Id. at 574-75 (quoting United States v. Watson, 423 U.S. 411, 418 n.6 (1976)).

The Payton Court recounted that while "[t]he Fourth Amendment protects the individual's privacy in a variety of settings," nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous

36

physical dimensions of an individual's home." Id. at 589. Quoting the Fourth

Amendment's mandate that "[t]he right of the people to be secure in their . . .

houses . . . shall not be violated," the Court explained:

> That language unequivocally establishes the proposition that "[a]t
> the very core [of the Fourth Amendment] stands the right of a man
> to retreat into his own home and there be free from unreasonable
> governmental intrusion." *Silverman v. United States*, 365 U.S. 505,
> 511 . . . [(1961)]. In terms that apply equally to seizures of property
> and to seizures of persons, the Fourth Amendment has drawn a firm
> line at the entrance to the house. Absent exigent circumstances,
> that threshold may not be reasonable crossed without a warrant.

Id. at 589-90.

So—absent exigent circumstances, a warrant is required for law

enforcement to enter a suspect's home. But what kind of warrant? In Payton,

the State argued that "only a search warrant based on probable cause to

believe the suspect is at home at a given time can adequately protect the

privacy interests at stake," and maintained that because obtaining a search

warrant was impractical, no warrant of any kind was required. Id. at 602. The

Supreme Court disagreed, concluding that "an arrest warrant founded on

probable cause implicitly carries with it the limited authority to enter a

dwelling in which the suspect lives when there is reason to believe the suspect

is within." Id. at 603. The Court reasoned that though "[i]t is true that an arrest

warrant requirement may afford less protection than a search warrant

requirement, . . . it will suffice to interpose the magistrate's determination of

probable cause between the zealous officer and the citizen." Id. at 602. In other

words, "[i]f there is sufficient evidence of a citizen's participation in a felony to

persuade a judicial officer that his arrest is justified, it is constitutionally

reasonable to require him to open his doors to the officers of the law." Id. at 602-03.

### 2. *Steagald v. United States*

One year after deciding Payton, the Supreme Court decided Steagald v. United States, considering "whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." Steagald, 451 U.S. at 205. The Court characterized the question as a "narrow" one: "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." Id. at 212. Officers had an arrest warrant for Ricky Lyons, and information that he might be found in Gary Steagald's home. Id. at 206. But when officers entered Steagald's home, they did not find Lyons. Id. While searching Steagald's home, however, the officers uncovered narcotics. Id. at 206-07. Steagald was arrested and indicted on federal drug charges. Id. at 207. Steagald moved to suppress the narcotics found in his home. Id.

The Supreme Court discussed the difference between an arrest warrant (which the officers had for Ricky Lyons) and a search warrant.

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review the interest protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate

38

object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

Id. at 212-213.

The Court found that the officers' arrest warrant for Lyons protected Lyons's interest in being free from an unreasonable seizure and authorized the officers to seize him. Id. at 213. But the Court observed that the officers had gone further than that—they had "relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there." Id. The Court opined that "while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect [Steagald's] privacy interest in being free from an unreasonable invasion and search of his home." Id. The only "protection" *Steagald* had from an illegal entry and search of his home, the Court said, was the officers' personal probable cause determination—and that was not reliable enough to justify the entry or the search. Id.

The Steagald Court explained that "[a] contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant—would create a significant potential for abuse." Id. at 215. It hypothesized that "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances," or could use the arrest warrant as a pretext for "entering a home in which the police have a suspicion, but not probable cause

39

to believe, that illegal activity is taking place." Id. (citations omitted). The Court concluded,

> In sum, two distinct interests were implicated by the search at issue here—Ricky Lyons' interest in being free from an unreasonable seizure and petitioner's interest in being free from an unreasonable search of his home. Because the arrest warrant for Lyons addressed only the former interest, the search of petitioner's home was no more reasonable from petitioner's perspective than it would have been if conducted in the absence of any warrant. Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment.

Id. at 216.

### 3. *United States v. Jackson*

Neither Payton nor Steagald involved a scenario where officers who had an arrest warrant for person A entered the home of person B to arrest person A and person A challenged that entry. Nor has the Supreme Court addressed that scenario. But over twenty-five years after the Supreme Court decided Payton and Steagald, the Seventh Circuit did.

In United States v. Jackson, Eric Jackson had an outstanding arrest warrant for aggravated battery. Jackson, 576 F.3d at 467. Officers unsuccessfully searched for him at relatives' residences, then got an anonymous tip that he had been staying at his father's girlfriend's apartment and would be there the next day. Id. On arriving at the identified residence— the home of LanDonna Joseph—the officers were invited into the vestibule by Joseph, and they presented her with a photo of Jackson. Id. After Joseph stated that she didn't recognize Jackson, the officers showed the photo to another woman sitting nearby (as it happened, Jackson's girlfriend), who, when

40

asked if Jackson was inside, nodded and began to cry. Id. The officers entered the apartment, found Jackson asleep in the back room, arrested him and found a "pistol within grabbing distance under the blanket on which he had been sleeping." Id. Jackson was charged with being a prohibited person in possession of a firearm. Id.

Jackson moved to suppress the firearm, arguing that "the police needed a search warrant as well as an arrest warrant in order to enter Joseph's apartment in order to arrest him." Id. Rejecting that argument, the Seventh Circuit recounted Payton's holding that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 468 (quoting Payton, 445 U.S. at 602). The court recited Steagald's holding that because the "[arrest] warrant application process does not protect the Fourth Amendment interests of third parties," "if officers enter a third party's residence in order to effect an arrest, the third party herself may have a Fourth Amendment claim against the officers." Id. (citing Steagald, 451 U.S. 204). The Seventh Circuit emphasized, however, that the Steagald Court was "quite explicit that 'the narrow issue before [the Court was] whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests *of persons not named in the warrant.*' [*Steagald*] at 212 . . . (emphasis added)." Id. at 468. Accordingly, the Seventh Circuit said, "[b]ecause it addresses only the Fourth Amendment rights of persons not named in an arrest warrant, *Steagald* did not hold that the subject of an arrest

41

warrant has a higher expectation of privacy in another person's residence than he does in his own." Id. And, the court pointed out, "nearly every court of appeals to consider the issue has held that law enforcement officers do not need a search warrant in addition to an arrest warrant to enter a third party's residence in order to effect an arrest." Id. (collecting cases).

That said, the Seventh Circuit explained that while officers don't "need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing that the suspect is actually present in the home." Id. The court pointed to Payton's holding that an arrest warrant "carries with it the limited authority to enter a dwelling when there is *reason to believe* the suspect is within," id. at 468-69 (emphasis in original) (quoting Payton, 445 U.S. at 602), and observed that courts of appeal were split on the meaning of "reasonable belief," id. at 469. The court explained that three circuits had held that "reasonable belief requires a lesser degree of knowledge than probable cause," while four other circuits had held that "'reasonable belief' amounts to the same thing as 'probable cause.'" Id. (case citations omitted).

The Seventh Circuit stated that, while it might be inclined to side with the courts that found "reasonable belief" synonymous with "probable cause," it didn't need to decide that issue because the officers in Jackson had probable cause. Id. The court recounted that the officers had a tip that Jackson was staying at the apartment and would be there the next morning, and that when they arrived and asked Jackson's girlfriend if he was there she nodded and started crying; the court concluded that "[t]his was more than enough to lead a

42

prudent person to believe that Jackson was inside the apartment when he or she entered." Id.

In 2016, the Second Circuit Court of Appeals came to the same conclusion, albeit using different language:

> We here adopt this reasoning as our own and join our sister circuits in concluding that the subject of a valid arrest warrant cannot complain that his Fourth Amendment right to be free from an unreasonable seizure was violated by apprehension in a third party's home, entry to which was not authorized by a search warrant. The arrest-warrant subject has no greater privacy rights in such circumstances than he would have had if the arrest had been made in his own home. Thus, if, at the time of entry, law enforcement officers possessed a valid warrant for the subject's arrest and reason to believe that he was on the premises entered, the subject of the arrest warrant will not be heard to complaint that entry was not authorized by a search warrant.[5]

Bohannon, 824 F.3d at 251.

### 4.   *The Applicable Legal Standard in This Case*

Payton held that for Fourth Amendment purposes, an arrest warrant for a suspect, coupled with "reason to believe" that the suspect is present in his home, is sufficient to authorize law enforcement to enter the *suspect's* home to arrest him. Payton, 445 U.S. at 602; see also United States v. Agnew, 407 F.3d 193, 196 (3d Cir. 2005) ("We note that *Payton* only addresses entry by officers into the residence of the subject of the warrant."). The defendant in this case has argued from the start, repeatedly, that the North 1st Street address where he was found and arrested was not his home. Because in this case, law

---

[5] The court understands that the defendant is not arguing—and has not argued at any point in the litigation—that the law enforcement officers needed a search warrant to enter Retic's residence.

enforcement did not enter the *suspect's* home—the *defendant's* home—the
Payton requirement that the government show that the officers had probable
cause to believe that the North 1st Street residence was the *defendant's*
residence does not apply.

Steagald held that before law enforcement may search the home of a
third party where they believe a suspect to be located, they must obtain a
search warrant. If they don't, the *third-party homeowner* may challenge the
search on Fourth Amendment grounds. In this case, *Retic* was the third-party
homeowner, but she is not the person challenging the search. Because the
party challenging the search—the defendant—is not the third-party
homeowner, the defendant cannot avail himself of the holding in Steagald.

As Judge Dries stated, the Jackson standard provides the applicable
framework for analyzing the facts in this case, in which officers with a valid
arrest warrant entered the home of a third party to arrest the subject of that
valid arrest warrant. Dkt. No. 52 at 10-11. Under Jackson, the officers needed
only an arrest warrant for the fugitive and "some basis"—probable cause or
something less—for believing that the fugitive was present in the third party's
home. Jackson, 576 F.3d at 468-469. Judge Dries correctly articulated the
applicable legal standard.

The defendant mischaracterizes what Judge Dries said in his report and
recommendation. The defendant asserts that Judge Dries "decided that Payton
has not two prongs, but one." Dkt. No. 61 at 3. Nowhere in his report did Judge
Dries state that the Payton framework has only one prong. Judge Dries

44

observed that the *parties* had briefed the suppression motion under a two-pronged framework based on their understanding of Payton. Dkt. No. 52 at 8 ("[T]he government argue[d] both that (1) [the defendant] resided with Retic and (2) was likely to be found there at the time of the arrest, and the defendant vigorously contest[ed] both points."). But he observed that that Payton's two-pronged standard would apply only "if the police had found evidence against . . . Retic and charged her with a crime." Id. at 9. Judge Dries explained that if that had been the case, "[Retic] could move to suppress and require the government to satisfy the two-part Payton framework." Id. Judge Dries explained, however, that "the two-part test proposed by the parties is not *wrong*, it's just that [the defendant] is the wrong person to be relying on it." Id. at 8 (emphasis in original). This court agrees.

Before asserting that Judge Dries misapplied Payton, the defendant dropped a footnote citing multiple cases which, according to him, support his proposition that "every court to consider a challenge under Payton has applied this two-part framework." Dkt. No. 61 at 3 & n.2. His argument assumes, however, that Payton is the correct case under which to challenge the seizure of the evidence in his case—an erroneous assumption, as demonstrated by several of the cases themselves. Of the ten cases the defendant cites, six involved the Fourth Amendment rights of the *homeowner* whose home officers entered, without a search warrant, in executing an arrest warrant for a guest. Covington v. Smith, 259 F. App'x 871, 872 (7th Cir. 2008); United States v. Vasquez-Algarin, 821 F.3d 467, 469-70 (3d Cir. 2016); United States v. Werra,

638 F.3d 326, 329-30 (1st Cir. 2011); United States v. Bervaldi, 226 F.3d 1256, 1258-59 (11th Cir. 2000); Risse, 83 F.3d at 214; El Bey v. Roop, 530 F.3d 407, 409-10 (6th Cir. 2008). Again, as he has argued repeatedly, the defendant here was not the homeowner; these cases are inapposite.

The four remaining cases—Brinkley, 980 F.3d 377; United States v. Lauter, 57 F.3d 212 (2d Cir. 1995); United States v. Gay, 240 F.3d 1222 (10th Cir. 2001); and United States v. Route, 104 F.3d 59 (5th Cir. 1997)—do hold that the two-pronged framework applies when officers execute an arrest warrant on the subject of that warrant when the subject is located in a third party's home. But those cases are not binding on this court, and all are odds with the Seventh Circuit's holding in Jackson, which *is* binding on this court.

The defendant asserts that none of the cases that Judge Dries cited in his report and recommendation—including Jackson—"hold that the Payton inquiry is limited to the presence prong." Dkt. No. 61 at 5. That is true, as far as it goes—but Judge Dries's report doesn't hold that, either. Those cases held, as did Judge Dries, that for officers to execute a valid arrest warrant for a suspect in a *third party's* home (as opposed to home of individual named on the arrest warrant—the situation in Payton), the officers need only probable cause (or perhaps something less) to believe the suspect is present in the third party's home when they enter. Jackson, 576 F.3d at 468-69; Bohannon, 824 F.3d at 253 ("Bohannon's seizure pursuant to a valid arrest warrant, and any search incident thereto, was reasonable if officers had reason to believe that he was present in Dickson's home at the time of entry."); United States v. Hollis, 780

46

F.3d 1064,1068 (11th Cir. 2015) ("If an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's [F]ourth [A]mendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another." (quoting Agnew, 407 F.3d at 197). Those cases did not alter Payton's framework, as the defendant suggests; they drew on Payton, but given the different facts, used the reasoning supporting Payton to set a new framework for a *different* factual scenario. See, *e.g.*, Agnew, 407 F.3d at 196 ("We note that *Payton* only addresses entry by officers into the residence of the subject of the warrant.").

        The defendant argues that the cases cited by Judge Dries "are inapposite because each are responding to erroneous arguments that the police needed a search warrant," pointing out that he never "argued that the officers needed a search warrant to enter Retic's home." Dkt. No. 61 at 5. He says that none of the cases Judge Dries cited "apply *Payton* as [Judge] Dries did in his Report and Recommendation." Id. It is true that the defendant never argued that the officers needed a search warrant to enter the North 1st Street residence to execute the arrest warrant. But it is *not* true that Judge Dries "applied" Payton to the facts of the defendant's case—he did not. Judge Dries held—correctly— that the Payton/Steagald framework does *not* apply to the facts of the defendant's case. The defendant's repeated assertions that Judge Dries "misapplied" the two-pronged Payton test ignores the fact that Judge Dries didn't apply the Payton test at all.

There is another reason that the defendant's insistence that the government must prove residence and presence makes no sense given the facts in his case. The <u>Payton</u> Court held that a valid arrest warrant, coupled with probable cause to believe that the subject of that warrant is present inside his home, is sufficient to justify entry to execute the arrest warrant. <u>Payton</u>, 445 U.S at 602-03 ("an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"). <u>Payton</u>'s holding is grounded in the understanding that an individual's Fourth Amendment right to privacy is most clearly defined in his own home, and that that is where his protection from government intrusion is greatest. <u>Id.</u> at 585, 589-90. If, as the defendant insists, the standard for arresting the subject of a valid arrest warrant in a third party's home requires officers to have probable cause to believe both that he would be present there *and* that he resided there, the defendant effectively has the same right of privacy and protection in a third party's home that he does in his own. That flies in the face of the reasoning in <u>Payton</u>.

The <u>Payton</u> Court emphasized that while the Fourth Amendment protects a person's privacy rights in "a variety of settings," in none of those settings

> is the zone of privacy more clearly defined then when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 . . . [1961].

48

Payton, 445 U.S. at 589-90. If officers must have the same probable cause to enter a third party's home to execute a search warrant that they must have to enter the subject's home to execute the search warrant, then the Fourth Amendment protects an individual's privacy to the same degree whether he is in his own home or in someone else's. The defendant has cited no case law supporting this novel interpretation of the Fourth Amendment.

The Eleventh Circuit put it another way. In Hollis—quoting the Third Circuit's decision in Agnew—the Eleventh Circuit explained that "[i]f an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's [F]ourth [A]mendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another." Hollis, 780 F.3d at 1069 (quoting Agnew, 407 F.3d at 197). The valid arrest warrant, plus probable cause to believe the subject is present in his own home, are enough to protect the privacy rights of a person being arrested in his own home, which means that a valid arrest warrant plus probable cause to believe the subject is present in a third party's home are enough to protect the privacy rights of a person being arrested in the third party's home.

Finally, the defendant argues that "the Seventh Circuit did not . . . eschew Payton's second prong in Jackson," but that because "the officers [in Jackson] received a tip that the suspect was staying at the apartment they searched," making Payton's residence prong "a non-issue." Dkt. No. 61 at 5. Similarly, the defendant argues that Bohannon, Agnew and Hollis "don't expressly assert Payton's residency prong" because the residency prong was

49

not contested in those cases; he contrasts this case, in which he has contested the government's failure to demonstrate probable cause to believe the defendant was a resident in Retic's home. Id.

The defendant speculates about why Jackson does not mention a residence prong; the decision does not articulate the rationale he describes. His speculation is belied by the opinion itself. Jackson holds that, "[a]lthough officers do not need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing that the suspect *is actually present* in the home." Jackson, 576 F.3d at 468 (emphasis in original). The court did not mention a requirement that police have "some basis" for believing the subject *resides* in the home, nor did it suggest that it assumed that Jackson lived at the third-party residence based on the "anonymous tip that Jackson had been staying at [that] apartment." See id. at 467.

Similarly, the courts in Agnew and Hollis explained that whether the residence was the defendant's was irrelevant to his motion to suppress. Agnew, 407 F.3d at 196 ("[T]here was no testimony at the suppression hearing about whether 2740 Ludwig Street was Agnew's residence. However, whether the home was Agnew's residence is ultimately irrelevant . . . ."); Hollis, 780 F.3d at 1068 ("Although the police did not believe that the apartment was Hollis's dwelling, that fact is of no help to Hollis[.]").

The court will overrule the defendant's objection to Judge Dries's finding regarding the applicable legal standard and will adopt that standard for the defendant's motion to suppress. The officers' entry into Retic's residence was

50

lawful if the officers had probable cause to believe that the defendant was inside.

B. Probable Cause as to Presence

As Judge Dries recounted in his report and recommendation,

[a] police officer has probable cause if the "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown," that the suspect would be found in the location in question. *Gonzalez v. City of Elgin,* 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). "Probable cause is a common-sense determination, measured under a reasonableness standard. . . . It is an objective test, based upon factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Humphrey v. Staszak,* 148 F.3d 719, 726 (7th Cir. 1998) (internal quotation marks omitted).

Dkt. No. 52 at 14-15. Judge Dries found that the officers had probable cause to believe the defendant would be inside the North 1st Street residence on the morning of his arrest because (1) in attempting to locate the defendant, the officers had engaged in a process of elimination, allowing them to narrow their search; (2) Facebook communications between Retic and the defendant indicated that they shared an intimate relationship, and that the defendant had stayed at Retic's residence during his period as a fugitive; and (3) the defendant's Mercedes was spotted outside Retic's residence two days before the search and on the morning of the search. Id. at 14-18. Judge Dries stressed that his conclusion that the officers had probable cause to believe the defendant was inside Retic's residence was not based on any one reason but on the combination of all three reasons: "[W]hen police know a fugitive is not at his typical places of residence, and when they spot one of his cars parked at

51

the home of a woman with whom he has a relationship, common sense dictates that the fugitive would probably be located in that home." Id. at 18.

Judge Dries found that the Facebook communications[6] between the defendant and Retic "indicate[d] an intimate relationship." Dkt. No. 52 at 15. The defendant picks at the significance of the messages on which Judge Dries based this finding. He argues that Judge Dries misunderstood why Retic referred to the defendant as "bae," that the "intimate" photo that Retic sent the defendant wasn't "intimate" and that Retic's message to the defendant telling him to "bring [his] ass home" did not suggest that they shared a home. Id. at 8-11. But the defendant does not contest Judge Dries's bottom-line conclusion that the Facebook materials revealed that Retic and the defendant had an intimate relationship. Rather, the defendant argues that the messages did not give rise to probable cause to believe that he would be in Retic's home on the

_____

[6]As discussed above, the defendant argued in his post-hearing brief that the officers couldn't rely on the information gathered from his Facebook account because the warrant they had to search the Facebook account was stale at the time they executed it. Dkt. No. 43 at 17-18. The defendant pointed out that Judge Joseph specified on the warrant that the deadline for executing the warrant (i.e., serving it on Facebook) was September 1, 2022, id. (citing Dkt. No. 43-1 at 2), but Deputy Smith indicated on the warrant return that it was executed on September 2, 2022, id. (citing Dkt. No. 33 at 61). Judge Dries determined in the report that Deputy Smith likely interpreted the "executed" date on the warrant to mean the date he "'received' the records from Facebook," rather than the date he "served the warrant on Facebook." Dkt. No. 52 at 18-19. And Judge Dries further found that even if the warrant was served on Facebook a day late, the belated execution would only be a constitutional violation if the "probable cause" supporting the warrant had dissipated by then—and Judge Dries determined it had not. Id. at 19-20. The defendant did not object to this finding. See Dkt. No. 61. The court will adopt Judge Dries's finding that the officers permissibly relied on the information obtained pursuant to the Facebook warrant.

52

morning he was arrested. Dkt. No. 61 at 7-11. Judge Dries did not conclude that the Facebook messages, by themselves, gave rise to probable cause—only that they were *one* factor contributing to that finding. Dkt. No. 52 at 15-16. And the defendant concedes in his objection that while he was on the run, he and Retic shared an "off-again-on-again affair," and he spent time at her place. Dkt. No. 61 at 8-10.

Judge Dries found that when police discovered the defendant's car parked outside the home of a woman with whom he shared an intimate relationship—both at 1:00 pm on September 7 and again nearly two days later—it was reasonable for them to conclude that the defendant would be inside. Dkt. No. 52 at 16. The defendant argues that Judge Dries attaches too much significance to the fact that his Mercedes was parked outside Retic's residence on those two occasions. He asserts that Judge Dries improperly dismissed the fact that he had several cars. Dkt. No. 61 at 11. The fact that he had other cars matters, the defendant contends, because it means that "[he] could have left his Mercedes outside Retic's [residence], gotten a ride home, and used his other cars for days, if not weeks." Id. He also argues that "it increases the likelihood that he lent the Mercedes to Retic." Id. at 12.

These arguments—in fact, many of the defendant's probable cause arguments—reflect a misunderstanding of the probable cause standard. "Probable cause is a common-sense determination, measured under a reasonableness standard. . . . It is an objective test, based upon factual and practical considerations of everyday life." Humphrey, 148 F.3d at 726. When

officers find a fugitive's car parked outside the home of someone with whom he shares a relationship, common sense dictates that the fugitive is *probably* inside the house. If the fugitive has other cars, it is *possible* that he left the car outside the house and is off using one of his other cars. It also is *possible* that the person with whom he has the relationship is borrowing the car. It is *possible* that the fugitive "parked there but [was] out in the neighborhood, [at] another nearby house, or elsewhere." Dkt. No. 43 at 16. That there are other *possible* explanations for why the defendant's car was outside Retic's house does not eliminate as a reasonable explanation that it was there because the defendant was inside, with Retic. As Judge Dries remarked, "[the police] are entitled—and required—to use common sense and exercise reasonable judgment. They are not expected to believe in longshot coincidences and rule out strong possibilities merely because the evidence is not ironclad." Dkt. No. 52 at 17. The defendant implies that officers cannot rely on one commonsense conclusion without first eliminating all other, possible commonsense conclusions. That is not the probable cause standard.

Judge Dries also gave weight to the "reasonable process of elimination" in which the marshals had engaged before zeroing in on Retic and her address. Dkt. No. 52 at 15. He noted that the defendant "had indicated to his probation officer that he would not be found at any residence already known to law enforcement" and that "the marshals' repeated drive-bys and other surveillance suggested [he] was not using his normal places of residence." Id. "[S]o after coming up blank at [the defendants'] most likely residences, officers were

54

reasonably entitled to focus on other possibilities that might otherwise have seemed more of a stretch." Id.

The defendant argues that "the idea that the officers reasonably ruled out the known addresses of [his] mother and fiancée" is undercut by "dozens of live videos [that he] broadcast from inside and outside those residences during his fugitive period." Dkt. No. 61 at 14-15. He argues that "[w]hen [Deputy] Smith received these videos, he should have returned to those addresses or sought additional information on those addresses through use of other investigative methods." Id. at 15. Again, the defendant's argument that the officers could have done a number of other things misapprehends probable cause.

The defendant also argues that while Deputy Smith zeroed in on Retic's address, he "lacked information showing that [that address] . . . was indeed Retic's residence in the first place or that the home was the same home Retic was living in at the time of her Facebook messages with [him]." Id. at 13. Deputy Smith testified at the hearing that he had obtained a copy of Retic's driver's license and that the address listed on her license was "3281 North 1st Street"—the address where the marshals apprehended the defendant. Dkt. No. 33 at 62. Smith also testified that at the time he obtained Retic's license he did not confirm who leased the apartment at the address on the license. Id. This was the only testimony from the two-day evidentiary hearing bearing on how the marshals determined Retic's address.

55

Defense counsel says that he "didn't question Deputy Smith on [the] issue . . . because the government had already done so and defense counsel was under no obligation to clean up the matter for the government." Dkt. No. 67 at 5. That's as may be, but defense counsel cannot have it both ways. Perhaps further questioning of Smith would have revealed that there was little evidence showing that Retic lived at the North 1st Street address, but because there was no further questioning, the only record evidence supports the conclusion that Retic lived at the 3281 North 1st Street address. Speculation that there might have been evidence showing otherwise is just that—speculation.

As to the Facebook live videos showing the defendant at his mother's home and his fiancée's home during the time he was a fugitive, the defendant is correct that those videos suggest that the defendant continued to, at least occasionally, return to those addresses. Recall that the defendant told his probation officer that he would "not go to any address [that he] wrote in prison or that [he] gave [the probation office]." Dkt. No. 33 at 12. That presumably included his mother's address and his fiancée's address—addresses he previously had given the probation office. Id. at 7-8. The marshals continued to monitor those addresses in case his message to his probation officer was a red herring. The officers did not—as the defendant suggests—"rule out" those two residences; they expanded their search because, at that point, monitoring those two residences had proved fruitless. Expanding the search to residences

56

other than those two was a reasonable step, and the fact that the defendant at times returned to those addresses while a fugitive does not make it less so.

Judge Dries recounted that at the evidentiary hearing, Retic's son "conceded that he 'probably' told officers that [the defendant] was [in the house]." Dkt. No. 52 at 4. The defendant vigorously objects to this finding, arguing that it is "entirely unsupported by the record." Dkt. No. 61 at 12-13. But given that any discussion of the son's confirmation of the defendant's presence is wholly missing from his probable cause analysis, Judge Dries apparently did not place much stock in the son's testimony. Dkt. No. 61 at 14-18. It appears that Judge Dries found that the officers had probable cause to believe that the defendant would be found in the house without Retic's son's confirmation of the defendant's presence. Given the contradictory nature of the son's testimony, this court agrees that that testimony was not relevant—or necessary—to the probable cause finding.

Three key aspects from the marshals' investigation into the defendant's whereabouts are undisputed. First, the marshals were aware that the defendant had told his probation officer that he would evade apprehension by staying at residences other than his "known" residences (*i.e.*, his mother's and his fiancée's). Second, Deputy Smith reviewed Facebook conversations between the defendant and Retic which reflected that the defendant had a relationship with Retic and had visited her while he was a fugitive. Third, while surveilling Retic's home, Deputy Smith saw the defendant's Mercedes parked outside the residence on September 7, 2022—two days before the defendant's arrest—and

on the morning of September 9, 2022—the day of his arrest. Judge Dries concluded that where "police *know* a fugitive is not at his typical places of residence, and when they spot one of his cars parked at the home of a woman with whom he has a relationship, common sense dictates that the fugitive would probably be located in that home." Dkt. No. 52 at 18 (emphasis added). The same is true where police are unable to find a fugitive at his typical places of residence, and they spot one of his cars parked outside the home of a woman with whom he has a relationship.

The court will adopt Judge Dries's conclusion that the officers had probable cause to believe that the defendant was inside Retic's residence on the morning of his arrest and that their entry into the residence was lawful.

C.    The Gun and the Drugs

As stated in Judge Dries's report and recommendation, "[t]he fact that [the defendant's] in-home arrest was sound does not necessarily mean the gun and drugs police found are admissible." Dkt. No. 52 at 20. That said, Judge Dries concluded that "the seizure of the firearm was . . . valid" given that it "was found in plain view next to the bed [in which the defendant was found]." Id. While the defendant objects that the entry into Retic's home was unlawful, he does not dispute Judge Dries's finding that the firearm was in plain view when the marshals entered Retic's bedroom. Dkt. Nos. 33 at 154; 61. Because the court has found that the entry into Retic's home was lawful and the defendant does not dispute that the firearm was found in plain view, the court

58

will adopt Judge Dries's finding that the plain-view doctrine justifies the seizure of the gun.

Judge Dries found that it was reasonable for Deputy Loesch to search the men's pants found on Retic's bedroom floor and that it was also reasonable for him to seize the drugs inside them. Judge Dries framed the question as "whether officers may affirmatively retrieve clothes for an unclothed individual they've just arrested." Dkt. No. 52 at 21. Drawing on caselaw from other circuits, Judge Dries found the answer to be "'yes,' so long as the need for clothing is reasonable and not a pretext to conduct a warrantless search." Id. at 21. Judge Dries observed that the defendant needed clothing before he was transported to the Milwaukee Federal Building. He also found that the officers retrieved the pants to cure this need—and not as some pretext to conduct a warrantless search. Finally, Judge Dries found that it was reasonable for the officers to search the pants before providing them to the defendant to wear. Id. at 22-24.

The defendant and the government referred to the "clothing exigency" exception to the warrant requirement and the defendant insists that the Seventh Circuit has not recognized such an exception. Cases from other circuits do not use the phrase "clothing exigency" exception, but they stand for the proposition that the fact a defendant is unclothed may constitute an exigent circumstance justifying entering a residence to retrieve clothing if the need for clothing is reasonable and not a pretext to conduct a warrantless search. See, e.g., United States v. Butler, 980 F.2d 619, 621-22 (10th Cir.

59

1992) (concluding that officers' decision to accompany an individual whom they just arrested into his residence to find shoes was reasonable, given the presence of broken glass scattered on the ground); United States v. Wilson, 306 F.3d 231, 240-41 (5th Cir. 2002) (the fact that the defendant was arrested outside his apartment wearing only boxer shorts and officers needed to protect him from exposure constituted exigent circumstances for the officers to go into his apartment to get clothing for him); United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000) (concluding that when officers arrested the defendant in a remote area during the evening hours in early May wearing only jeans, the fact that he could injure his feet or get cold constituted an exigency justifying the officers' temporary entry into his home to obtain clothes, and that that entry was reasonable).

Following the evidentiary hearing, both the defendant and the government briefed the issue of whether the officers lawfully searched the defendant's pants under this "clothing exigency" exception. The government cited cases like Gwinn and Wilson, as well as Clay, 408 F.3d at 218, in which the court concluded that the "need to procure footwear for [the defendant] constituted exigent circumstances justifying [the officer's] return to the bedroom [after officers had removed the defendant from it]." Dkt. No. 48 at 21. It observed that, unlike the facts in these cases, the marshals did not re-enter Retic's house to obtain clothing—they were lawfully present when they retrieved the pants and when they found the drugs in the pocket of those pants. Id. The defendant insists that the search for his clothing was

60

"pretextual." Dkt. No. 51 at 14-15. He asserts that when officers asked whether he had a pair of stonewashed jeans, the defendant originally denied owning them and asked for shoes, and he asserts that both the testimony at the evidentiary hearing and the body-worn camera footage show that Deputy Loesch searched the jeans before the defendant acknowledged that they were his. Id. at 15.

These cases support the conclusion that if the officers' decision to clothe the defendant before transporting him to lockup in the federal building was reasonable and not merely a pretext to conduct a warrantless search, then the warrantless search of the defendant's pants meets constitutional muster. So, the court turns to the evidentiary hearing testimony.

On day one of the evidentiary hearing, Deputy Loesch testified on direct examination that "[a]fter the defendant was taken into custody, and Ms. Retic had been detained, [the officers] did a cursory check of the room for additional persons and proceeded to hold that room." Dkt. No. 33 at 155-56. Loesch explained "that [the officers] knew [they] were going to be within the home for a period of time," because they had found "a firearm in plain view with a known convicted felon." Id. at 156. Loesch confirmed that he remained in the "bedroom for a while," and recounted how, during that time, he communicated to the other officers over their radios, pointing out that they needed to confirm that Retic was not a felon. Id. at 156-57. Loesch recounted how, during the officers' radio communications, "the concept of clothes for [the defendant] . . . came up because he was only wearing boxer shorts" and they "needed to get

61

[him] dressed so [they] could get him in transport to the courthouse." <u>Id.</u> at 157. Loesch testfied that he "asked about clothing for [the defendant] on our radios." <u>Id.</u> After "receiv[ing] a reply that [the defendant] would have clothing at the foot of the bed," Loesch identified "a T-shirt and a pair of jeans" at the foot of the bed and relayed to the officers what he had found. <u>Id.</u> Loesch testified that he was under the impression that officers "on the other end of the walkie-talkie [were] speaking with [the defendant] trying to ascertain" whether the clothes were the defendant's. <u>Id.</u>

Loesch did not receive confirmation that the clothes were the defendant's, but seeing that the clothes "were the only male clothes at the foot of the bed," he "start[ed] searching the pants to ensure there was no contraband inside of them." Dkt. No. 33 at 158. He explained that they "would not want to dress a person with contraband inside their clothing and introduce that into our cell block." <u>Id.</u> He also explained that part of the rationale for searching the pants was to ensure the safety of the unarmed officers who would be accompanying the defendant on the ride downtown. <u>Id.</u> Loesch testified that "[i]f there had not been a need to clothe [the defendant]," he would not have "searched inside his clothing without a warrant or his consent." <u>Id.</u> at 159.

On recross-examination of Loesch, defense counsel confirmed that after being taking into custody, the defendant "asked for a pair of . . . grey Nikes." Dkt. No. 33 at 211. When asked whether he ever found those grey Nikes, Loesch responded that he didn't "remember checking any pair of shoes." <u>Id.</u>

Defense counsel then pulled up an exhibit showing Retic's bedroom in which the grey Nikes could be seen, and asked whether the shoes were taken to the defendant. Id. Loesch testified that while body-worn-camera footage confirmed that the defendant had asked about his shoes, Loesch did not "recall being told about the shoes." Id. at 211-12. When shown another video in which an officer relays the defendant's request for his Nikes, Loesch conceded that the defendant's request for the Nikes was communicated over radio. Id. at 212-13. But he reiterated that he did not recall hearing about or looking for the shoes. Id. at 213. When asked to confirm that he heard the radio communication about the defendant's clothes, Loesch explained that "the clothing was his primary objective because [the defendant] was wearing boxer shorts." Id.

The defendant argues that Judge Dries' report disregards facts demonstrating that the officers' stated need to clothe him was a pretext to conduct a warrantless search. Dkt. No. 61 at 15. He points out that after the officers arrested him and removed him from Retic's house, they "sat [him] outside dressed in nothing other than his boxer shorts," keeping him "there in that state for several minutes before removing him to a van." Id. He argues that officers ignored his request for his shoes, giving him his pants "moments before they booked him into custody." Id. And he argues that the officers ransacked Retic's home, despite Judge Dries finding otherwise. Id. "The photographs taken of Retic's bedroom," for example, "show clothes strewn about, drawers emptied, and belongings scattered." Id. He adds that several minutes after his

63

arrest, "[Deputy] Loesch exited the home sweating as if he had just exerted himself" while searching the home for additional evidence. Id. at 16.

Judge Dries found "far too cynical" the defendant's argument that the search for clothing was pretext. Dkt. No. 52 at 22. He also concluded that the argument "ignore[d] the context of the situation." Id. The court agrees on both counts. As Judge Dries explained, the officers were at Retic's residence on the morning of September 9, 2022 to apprehend the defendant, a known felon evading a federal warrant—not to investigate or to find incriminating evidence. Having found the defendant within arm's reach of a firearm, however, the officers were on alert. Some moved to secure the premises while others were occupied with sussing out the legal implications of the firearm, which involved determining whether Retic also was a felon and whether she needed to be taken into custody. Although the defendant remained in boxer shorts for some time before the officers focused on finding clothes for him, it's no surprise that finding clothing for the defendant was not an immediate priority.

After the dust had settled, Retic's residence was secure and the officers had confirmation that they could remove Retic's handcuffs, the officers started preparing to transport the defendant to the marshals' lockup downtown. For obvious reasons, placing a near-naked man in a van for transport to the federal building downtown and booking into lockup was unacceptable, so the officers set out to find clothes for the defendant. Loesch, who remained in the bedroom where the defendant and firearm had been found, received communication that he would find the defendant's clothing at the foot of the bed. There, Loesch

located the only men's clothing in sight—a t-shirt and a pair of jeans. That Loesch's primary objective was finding clothes for a nearly naked defendant is understandable. While the defendant questions why he didn't also retrieve the grey Nikes, that oversight is easy to critique with, as Judge Dries put it, "the spurious 20/20 vision of hindsight." Dkt. No. 52 at 22. And it appears that the marshals did find shoes for the defendant before transporting him. Officer Leannais, who accompanied the defendant downtown, testified that when he arrived at the federal building the defendant was wearing a pair of tennis shoes. Dkt. No. 33 at 224.

To support the contention that the officers ransacked Retic's home (for the purpose, he asserts, of looking for evidence against the defendant), the defendant points to Retic's testimony from the evidentiary hearing in which she describes post-search photographs taken of her bedroom. Dkt. No. 61 at 15 (citing Dkt. No. 34 at 105-106). According to the defendant, Retic's testimony supports the conclusion that the officers ransacked her bedroom, searching for incriminating evidence. But Retic's testimony was less than clear. She stated that her room appeared "ram shacked" and that "things [appeared] thrown around," but she also conceded several times that her room wasn't "neat" or "clean" prior to the officers' arrival and suggested that things looked to be out of place. Dkt. No. 34 at 105-106. Retic's testimony is too vague and equivocal to support the conclusion that the officers ransacked her room looking for incriminating evidence. The defendant's argument that Loesch's sweaty appearance suggested that he was "searching the home for additional evidence"

65

ignores the facts that Loesch was clad in heavy tactical gear on a humid, early-September morning and had just discovered the fugitive subject of an arrest warrant in a dark room beside a firearm. It makes sense that Loesch (or anyone else) would be sweaty under such circumstances; concluding that he was sweaty because he was ransacking the house for evidence is, like several of the defendant's other arguments, speculative.

The officers' decision to find clothing for the defendant before transporting him downtown was reasonable, and it was reasonable for them to ensure that there was no contraband in the clothing before giving it to the defendant. The court adopts Judge Dries's recommendation that it deny the motion as to the search of the defendant's pants.

## V. Conclusion

The court **OVERRULES** the defendant's objection. Dkt. No. 61.

The court **ADOPTS** Judge Dries's report and recommendation. Dkt. No. 52.

The court **DENIES** the defendant's motion to suppress. Dkt. No. 20.

The court will separately communicate with the parties regarding the next steps in the litigation.

Dated in Milwaukee, Wisconsin this 14th day of February, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

66